In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4113

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHNNIE BOND,

Defendant-Appellant.


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 CR 73--Charles N. Clevert, Judge.


Argued September 14, 2000--Decided November 3, 2000


Before ROVNER, DIANE P. WOOD, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  Before he was nabbed,
Johnnie Bond made $4 million out of shady real
estate deals in the inner city of Milwaukee,
Wisconsin. Having been caught, and now convicted
on two substantive violations of 18 U.S.C. sec.
2314 and one count of conspiracy to violate that
provision, Bond appeals, contending that the
evidence was insufficient to support his
convictions.

Bond's appeal is from the denial of his motion
for a judgment of acquittal. To prevail, he must
establish that, judging the evidence in the light
most favorable to the United States, no rational
trier of fact could find the essential elements
of a charged offense beyond a reasonable doubt.
United States v. Hill, 187 F.3d 698 (7th Cir.
1999). This is a rigid standard, and we reverse
"only when the record is devoid of any evidence,
regardless of how it is weighed, from which a
jury could find guilt beyond a reasonable doubt."
United States v. Thompson, 106 F.3d 794, 798-99
(7th Cir. 1997). We recite the facts with that
standard in mind.

Bond operated at least six companies in
Milwaukee which were involved in residential real
estate transactions. Between June of 1997 and
March of 1999 he falsified documentation on more

than 150 real estate transactions and in the process skimmed more than $4 million in loan proceeds. With federal agents closing in on him, in April 1999 Bond appeared in the office of the United States Attorney and gave a statement admitting his fraud. Apparently thinking better of his conversations with the prosecutor's office, Bond denied on the stand at his jury trial that he was guilty or that he had admitted fraud to the U.S. Attorney. He said he went to the U.S. Attorney's office to explain his conduct, not to confess guilt.

In any case, what the government determined upon investigation of Bond's conduct was that he induced owners of residential property in Milwaukee's inner city to sell properties to him by saying he would improve and then resell them to inner-city residents. Bond made sure he was not the purchaser of record. He recruited "investors" who allowed their names and credit to be used for mortgage loans to finance the purchases. The investors were not required to put any money down, and the profits from the resale, which in fact never occurred, were to be split between them and Bond. Bond promised each investor that he would receive about $6,000 when the deal closed.

Bond's companies were the ones who solicited the real estate mortgage loans to fund the purchases. The documentation which the companies forwarded to the lenders in support of the loans, not surprisingly, did not reflect the actual deal. For one thing, the purchase prices listed were vastly inflated. For example, Bond agreed to buy a property at 2229-31 North 47th Street for $35,000, but the lending company and the investor were told that the purchase price was $70,000. The lending company was also told that the investor was making a down payment of $15,677.37, which was supposedly on deposit in an account at Tri City National Bank in Milwaukee. Bond said he would bring the money to the closing in the form of a cashier's check. The lender, in this case an Illinois company, sent $56,000 to fund the deal. Bond took control of the proceeds in excess of the amounts due the seller by representing to the closing agent that the funds were for "rehab" work that one of his companies had performed. But of course the work was not performed.

Amazingly, the scheme was repeated 150 times. Bond skimmed money using construction invoices, invoices from other real estate businesses, and businesses such as True Management Group for which he obtained "management" fees. The mortgages exceeded $8 million; the amount of fraudulent down payments was more than $2 million.

Tri City's cashier's checks and account verifications were used for each transaction. The cashier's checks were brought to the closing as down payments. The verifications were used to show that the buyer had used an account balance to fund the cashier's check. In reality, the cashier's checks were issued without funds to back them up. Bond managed this sleight of hand because he was paying bribes to a bank employee. That employee and a vice-president of the bank were aware of the fraud.

Bond's fraud left lenders holding mortgages that far exceeded the value of the properties. Predictably, the mortgage notes went into default. And because the scheme left no money to cover repairs, the properties failed to meet Milwaukee code requirements.

After he was convicted and sentenced to 97 months in prison and ordered to make restitution in the amount of $1.9 million, Bond filed this appeal. He points out that the indictment alleges a scheme to defraud mortgage lenders, investors, and the City of Milwaukee and that the jury instructions contain similar language. His contention seems to be that because the victims are set out in the conjunctive, the scheme as alleged must necessarily include fraud on the City. But, he contends, there is insufficient evidence to support a finding that the City of Milwaukee was a victim of the fraud and therefore his conviction must be overturned. For several reasons (almost any one of which could stand alone), we find the argument unconvincing.

Bond was accused of violating the first paragraph of sec. 2314, which provides that

[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

. . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

He was not charged under paragraph two, which applies, in part, to those "having devised or intending to devise any scheme or artifice to defraud . . . [.]"

The elements of a paragraph one offense are that the defendant caused money to be transported in interstate commerce; that the money exceeded $5,000; that the money was taken by fraud; and

that the defendant knew the funds had been obtained by fraud. United States v. Gooch, 120 F.3d 78 (7th Cir. 1997); United States v. Jaderany, 221 F.3d 989 (7th Cir. 2000). There is no requirement for a scheme to defraud, though we have to admit that it is a mind-bending task to imagine a fraud without a scheme to defraud. What, after all, is a scheme to defraud? It is a plan for how to effectuate the fraud. Because "fraud" is not something that happens by accident, we can agree with the government when it argues that "fraud" and "scheme to defraud" pretty much mean the same thing in the statute.

We encountered a cousin of Bond's argument in United States v. Quintanilla, 2 F.3d 1469 (7th Cir. 1993), where, as here, the government set out a charge under paragraph one as involving a "scheme to defraud." Quintanilla claimed that he predicated his defense on refuting that there was a "scheme to defraud." Then some counts of his indictment were dismissed and the indictment was redacted. In the process of redaction, reference to a "scheme to defraud" was eliminated. We rejected Quintanilla's claim that the alteration of the indictment deprived him of his right to notice of the charges against him. We stated that participation in a "scheme" to defraud is not an essential element of a paragraph one offense and, quoting United States v. Miller, 471 U.S. 130, 136 (1985), we said that a part of the indictment which is unnecessary to the allegations of the offense "may normally be treated as a 'useless averment' that 'may be ignored.'" So long as a fraud was proved, the reference to a scheme was a useless averment. Similarly, in Gooch, 120 F.3d at 80, we said that a reference to a "scheme to defraud" in a paragraph one charge "is mere surplusage and will therefore be disregarded." There is no requirement in paragraph one of sec. 2314 that there be a "scheme" or that victims of the scheme be identified.

Bond's precise argument on this point is hard to pin down, but he seems to be saying that the government said he was involved in a scheme to defraud three victims and now it is stuck with that claim. A related argument was made in United States v. Mastrandrea, 942 F.2d 1291 (8th Cir. 1991), a case we relied on in Quintanilla. The Mastrandrea court said that a scheme to defraud is not an element of a paragraph one offense, and including the phrase in the indictment does not make it an element.

Furthermore, even if proof of the identity of victims of the scheme was an essential element of the crime, the general rule is that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunction . . .

the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Turner v. United States, 396 U.S. 398, 420 (1970). In Griffin v. United States, 502 U.S. 46 (1991), the Court considered a challenge to a conviction based on an indictment which stated that the objectives of a conspiracy were to impede the Internal Revenue Service in computing taxes and to impede the Drug Enforcement Administration in obtaining forfeitable assets. The objects of the conspiracy were set out in the conjunctive in both the indictment and the jury instructions. The defendant contended that the evidence was not sufficient to connect her to the object of the conspiracy involving the DEA. She proposed instructions to the effect that she could be convicted only if the jury found she was aware of the object of the conspiracy involving the IRS. She requested special interrogatories asking the jury to identify which of the objects of the conspiracy she was found to have had knowledge. Her requests were denied. The Supreme Court upheld the conviction based on a general verdict. It distinguished cases which set aside general verdicts because one of the alternate bases of conviction was unconstitutional [Stromberg v. California, 283 U.S. 359 (1931)] or illegal [Yates v. United States, 354 U.S. 298 (1957)]. In Griffin, as here, the argument was merely that one of the bases of conviction was not supported by sufficient evidence. Relying on the language from Turner, which we just quoted, the Court found no merit to the contention that the conviction was invalid. We see no reason to decide otherwise in Bond's case. There was far more than sufficient evidence that investors and lenders were victims of Bond's fraud.

Concluding as we do, that the scheme and the parties defrauded are not elements of the offense, and that even if they were, the conviction would stand because there is more than sufficient proof of investors and lenders being victims, we will nevertheless proceed to other, much simpler, reasons why Bond's argument fails.

First, having concluded that it is unnecessary, we note that there is, in fact, evidence that at least in some instances the City was victimized. As we have said, we will reverse a conviction based on a claim that the evidence is insufficient only when the record is devoid of any evidence on which a conviction could be based. Gooch. Here, Bond finds comfort in the fact that the district judge called the evidence that the City suffered "scant." And Bond thinks scant means nonexistent. We think, rather, that the evidence was scant only in comparison to the evidence of fraud of lenders and investors. But that does not mean that the record was devoid of

evidence. The government is not required to prove that all victims were equally harmed or that the City was hurt as much as the lenders or investors. Several of the investors--Gregory Powell, Phil Holidy, Lela Manning, Regina Cleveland, and Beverly Montgomery--testified about the run-down condition of the property they now own. Holidy testified that Bond falsely represented that he would handle City of Milwaukee code compliance requirements, but at the time of trial Holidy held properties with several code violations. Holidy also testified to the gap between the appraisals cited in the loan documents and the city assessments. He testified that he was informed by the City that the assessment on one of his properties had, in fact, dropped. Powell testified to code compliance citations from the City, which persons at Bond's companies said they would take care of but which they did not correct. So, unnecessary though it was, there was evidence of the victimization of the City.

Turning to another reason we reject Bond's argument, we look specifically at count one. It alleges a conspiracy to cause in excess of $5,000 to be transmitted in interstate commerce knowing the funds had been obtained through a scheme to defraud. As with any conspiracy allegation, the government need not prove a completed underlying crime. United States v. Seawood, 172 F.3d 986 (7th Cir. 1999). The government need only prove the existence of an unlawful agreement. Here, there was evidence of an agreement. Antoinette Higgins, a former employee of Bond's companies, testified that Bond asked her to make up numbers for an account verification. Annette Reynolds, a vice-president at Tri City, testified that, under an arrangement with Bond, she and another bank employee allowed unfunded cashier's checks to be issued. The checks were used as part of the loan scheme. There is sufficient evidence to support the conspiracy count.

The same is true of the substantive offenses set out in counts two and three. These counts charge that Bond knowingly caused $68,800 and $56,000, respectively, to be transmitted in interstate commerce knowing the funds had been obtained through the scheme to defraud. As we have said, Bond contends that because the "scheme to defraud" set out in the indictment lists as victims investors, lenders, and the City, the government must prove, as to each count, that all three were defrauded. That contention could not be sustained even if the scheme to defraud the victims were an essential element of the offense. Counts two and three are specific substantive violations arising out of the fraud. A specific offense could very well involve a scheme to

defraud in which the victim was an investor only, or a lender only, or for that matter the City only. That would not detract from the possibility that a scheme to defraud all three existed. A specific offense can be a subset of the scheme.

For all of these reasons, the conviction of Johnnie Bond is

AFFIRMED.