# In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 01-2283 & 01-4078

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDWIN MARRERO and DAVID HERNANDEZ,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 368—**William J. Hibbler**, *Judge.*

---

ARGUED APRIL 5, 2002—DECIDED AUGUST 5, 2002

---

Before FLAUM, *Chief Judge,* and POSNER and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendants, "Little Bum" Marrero and "Fat Man" Hernandez, lured three drug dealers from Detroit to a rendezvous in Chicago on the pretext of selling them cocaine. When the dealers arrived, the defendants showed them what purported to be cocaine but was actually flour with a thin coating of cocaine, then robbed them at gunpoint of the $25,000 that the dealers had brought with them to make the purchase. The defendants were convicted by a jury of violating the Hobbs Act, 18 U.S.C. § 1951, and of a firearm offense, and

received very heavy sentences—324 months for Marrero, 192 months for Hernandez.

The Hobbs Act criminalizes robberies that obstruct or otherwise affect interstate or foreign commerce, and the main issue raised by this appeal is whether the robbery of the drug dealers had the requisite effect on commerce. We set to one side the defendants' arguments that the dealers may have been "from Detroit" only in the sense of having been born or raised there and that they may not have been dealers at all but merely purchasers for their own consumption. We are required to construe the facts as favorably to the government as the record permits, and that construal requires us to reject these anyway rather fanciful hypotheses about the robbery victims.

Of course, there is an element of paradox in a prosecution for obstructing *illegal* commerce (the government does not seek to defend the judgment on the ground that the defendants' scheme affected the interstate trade in flour); one might as an original matter have thought that were it not for concerns about encouraging violent activities, such as armed robbery, the obstruction of illicit commerce should be rewarded rather than punished. The less protection the law gives drug dealers, the higher the price of illegal drugs and so the smaller the quantity consumed—the very aim of the "war on drugs." But, quite apart from the fact that the defendants were also drug dealers, whose theft from other dealers might aid the defendants' drug dealings, any argument that the Hobbs Act, or Congress's commerce power (exerted to the full in that Act, *Stirone v. United States*, 361 U.S. 212, 215 (1960); *Evans v. United States*, 504 U.S. 255, 263 n. 12 (1992); *United States v. Peterson*, 236 F.3d 848, 851-52 (7th Cir. 2001)), does not reach robberies that disrupt rather than promote illegal trafficking in drugs is foreclosed by

the case law, e.g., *United States v. Esposito*, 771 F.2d 283, 286 (7th Cir. 1985); *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984); *United States v. Jones*, 30 F.3d 276, 285-86 (2d Cir. 1994), and wisely not pressed by the appellants.

This case would be a very easy one for the government if, as in *United States v. Thomas*, 159 F.3d 296, 297-98 (7th Cir. 1998), and *United States v. Jones, supra*, 30 F.3d at 280, 285, the defendants had robbed a confidential informant of his "buy money." Such a robbery would interrupt a transaction in commerce (since all cocaine originates outside the United States), and, as it happens, a socially valuable one, since a "controlled buy" is an efficient method of apprehending drug dealers. See also *United States v. Bailey*, 227 F.3d 792, 795, 798 (7th Cir. 2000). There was no interruption of a transaction in commerce in the present case, because the defendants had no drugs, only flour that was not for sale. (There was no suggestion in *Thomas* that the defendants did not have cocaine to make the sale to the confidential informant—so far as appears, they simply decided they would be better off with both the cocaine and the purchase money rather than with just the money.) Had our defendants not robbed the Detroit dealers, there would have been no transaction—at least with them.

But the qualification is vital. Had the defendants not lured the Detroit dealers to Chicago, those dealers would have used their $25,000 to buy cocaine elsewhere, and that purchase, a transaction in commerce whether it would have been made in Detroit or elsewhere because, as we said, all cocaine originates overseas, thus was thwarted, and commerce therefore obstructed, by the robbery. *United States v. Thomas, supra*, 159 F.3d at 297-98. (This is the "depletion of assets" theory of Hobbs Act jurisdiction. It is orthodox. See, e.g., *United States v. Peterson, supra*, 236 F.3d at 854, 856; *United States v. Jones, supra*, 30 F.3d at 285.) Of

course this is a prediction, not a certainty. Maybe the Detroit dealers had no other potential source of cocaine (maybe that's why they could be lured to Chicago), and after searching a bit would have decided to use the money to buy something quite local. But the cases do not require certainty of effect on commerce; a reasonable probability is enough, e.g., *United States v. Peterson, supra*, 236 F.3d at 851-52; *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976) (per curiam), and is present here, especially since as we said the defendants were themselves drug dealers, so that, had they not been apprehended, some of the money they stole might have been used to buy cocaine. Nor is it necessary that the individual criminal act, here the robbery of the Detroit dealers, be shown to have a measurable impact on commerce, which would usually be impossible to show. It is enough if the class of acts has such an impact. *Perez v. United States*, 402 U.S. 146, 153-54 (1971); *United States v. Thomas, supra*, 159 F.3d at 298; *United States v. Hale*, 978 F.2d 1016, 1018 (8th Cir. 1992). Deciding what shall count as a class is difficult, but not in this case. Whether the class is defined broadly as theft from drug dealers or narrowly as theft of cash from drug dealers, it is undoubtedly large enough to have *some* effect on the drug trade, or what is just as good, would have such an effect if the law did not punish such thefts and by punishing them deter many of the potential thieves and incapacitate the actual ones who are apprehended. Cf. *United States v. Olin Corp.*, 107 F.3d 1506, 1510 and n. 8 (11th Cir. 1997); *Proyect v. United States*, 101 F.3d 11, 13 (2d Cir. 1996) (per curiam). In either event, it is legitimately punishable under Congress's power to protect interstate commerce from obstruction.

The case might conceivably be different (we do not hold that it would be) if the Detroit dealers, being hopelessly impecunious, had brought with them only a few hundred

dollars, hoping to persuade the defendants to sell them cocaine at a ridiculously low price and knowing that if they failed to persuade them they would have to abandon their quest altogether. Then it might be untenable to argue that, had they not been robbed, they would have bought cocaine elsewhere; it would be arguable instead that we should recognize a class of attempted drug transactions that, having no effect on commerce even in the aggregate, fell outside the jurisdictional scope of the Hobbs Act. But that is not our case.

We are troubled, however, by the inability of the government's lawyer either in his brief or at argument to suggest a limiting principle in Hobbs Act prosecutions, despite the Supreme Court's evident concern not to allow the concept of "commerce" (interstate or foreign) to expand to the point at which every transaction in the American economy would be within Congress's reach. *United States v. Lopez*, 514 U.S. 549, 564 (1995); *United States v. Morrison*, 529 U.S. 598, 615 (2000); see *United States v. Hicks*, 106 F.3d 187, 189 (7th Cir. 1997). Before *Lopez*, courts, including our own, were not fussy about the jurisdictional requirement of the Hobbs Act. See, e.g., *United States v. Rindone*, 631 F.2d 491, 493-94 (7th Cir. 1980) (per curiam); *United States v. Peete*, 919 F.2d 1168, 1175 (6th Cir. 1990). But we are in a new era and must be wary of such arguments as that the theft of a bottle of aspirin from a person's home "affects" commerce, provided only that the bottle was shipped from another state, because the homeowner would be likely to buy another bottle from his local druggist to replace the one that was stolen and the druggist would replace that sale by purchasing another bottle interstate.

Some cases indeed draw the line between a theft from the home and theft from a store (see *United States v.*

*Lynch*, 282 F.3d 1049, 1053-54 (9th Cir. 2002), summarizing the case law), since an extra step (the local purchase of the new bottle from the drugstore) must be taken in the first case before one gets to the interstate transaction. But that line—which incidentally is supported by the "noncommercial" character of the activity involved in *Lopez* itself (schooling), and by the Supreme Court's recent decision interpreting the federal arson statute to be limited to commercial buildings, an interpretation adopted in part at least to avoid having to decide Congress's power under the commerce clause to make burning down a private residence a federal crime, *Jones v. United States*, 529 U.S. 848, 858-59 (2000)—would not help the defendants in the present case. They stole from a business, the drug business of the three dealers, that was engaged in interstate or foreign commerce. The dealers' business was "in commerce" not only because it bought its merchandise (cocaine) from out of state but also because conducting the business involved crossing state lines when the dealers came to Chicago to try to buy drugs from the defendants. *United States v. Carcione*, 272 F.3d 1297, 1301 (11th Cir. 2001); *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996); see also *United States v. Schaffner*, 258 F.3d 675, 683 (7th Cir. 2001); *United States v. Griffith*, 284 F.3d 338, 347 (2d Cir. 2002).

The only other issue presented by the appeal involves Marrero alone and is whether for sentencing purposes his two prior convictions for drug offenses were "related" to each other. They were (so far as bears on this case) if they "were part of a single common scheme or plan." U.S.S.G. § 4A1.2, Application Note 3; see *United States v. Brown*, 209 F.3d 1020, 1023 (7th Cir. 2000); *United States v. Ali*, 951 F.2d 827 (7th Cir. 1992). And if they were related in this sense, he should not have been given, as he was (it is a major reason for his outsized sentence), an enhanced

sentence for being a "career offender." §§ 4B1.1, 1.2(c). The first conviction was for buying 7.8 grams of cocaine from an undercover agent. The agent told Marrero that he'd be back if the cocaine turned out to be "decent." Two and a half months later the agent was back and bought 45 grams of cocaine from Marrero. The two sales would have been part of the same plan if before the first sale Marrero and the agent had agreed that the agent would make two or more purchases from Marrero. *United States v. Joy*, 192 F.3d 761, 770-71 (7th Cir. 1999); cf. *United States v. Lechuga*, 994 F.2d 346, 349-50 (7th Cir. 1993) (en banc). But there was no such agreement. The relatively small sizes of the purchases, their separation in time, and their over-all fewness all point to a casual buyer-seller relationship rather than to a broader agreement whereby Marrero un-dertook to supply the agent on a repeat basis, let alone to a conspiracy to distribute drugs rather than a mere sales contract. Compare *United States v. Sanchez*, 251 F.3d 598, 601-02 (7th Cir. 2001). A person who buys a honeydew melon from a grocery store and tells the sales clerk that if the melon is good he'll be back is not thereby agreeing to buy another melon from the store. If he changed his mind and, while liking the melon, never went back to that store he would not be violating any agreement. No more would the agent have been violating an agreement with Marrero if he had not come back and made a second pur-chase from Marrero. Not that an agreement is always re-quired to show a common scheme or plan—the test is whether the second crime was "anticipated and planned when the original crime was planned or committed," *United States v. Ali, supra*, 951 F.2d at 828—but in the absence of an agreement in this case there is no evidence that Mar-rero anticipated and planned the second sale, which de-pended on what the agent did.

The sentencing enhancement was therefore proper. Cf. *United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002); *United States v. Thomas*, 150 F.3d 743, 744-45 (7th Cir. 1998) (per curiam).

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*