# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 01-3804, 01-3805, 01-3853 & 01-3865

UNITED STATES OF AMERICA,

                                        *Plaintiff-Appellee,*

        v.

M.L. MOORE, ALEX RAMOS, JAMES P. YOUNG,
and EDWARD L. JACKSON, JR.,

                                        *Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 CR 815—**Charles P. Kocoras**, *Chief Judge.*

_____

ARGUED MAY 15, 2003—DECIDED APRIL 9, 2004

_____

Before BAUER, COFFEY, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Before us is a group of crooked former members of the Chicago Police Department (CPD) who were set up and eventually busted by the CPD's Internal Affairs Division (IAD) and the FBI. The police officers, who devoted a considerable amount of effort to making money from local drug dealers (and undercover agents whom they mistook for drug dealers) through robbery and acts of extortion at the expense of their public duties, were eventually charged in a 39-count superseding

indictment with various racketeering, extortion, robbery, drug, and weapons violations. They were tried together and are now before us in a consolidated appeal challenging different aspects of their convictions and sentences. Because we find no reversible error in any of the judgments, we affirm.

# I

Prior to their arrests and convictions in this case, appellants M.L. Moore, Alex Ramos, James P. Young, and Edward L. Jackson, Jr. (to whom we refer collectively as the Officers) were Chicago police officers assigned to the CPD's tactical unit in Chicago's 15th District—the Austin District. Tactical unit officers work undercover to combat illicit drug and gang-related activities. These particular officers worked with drugs and gangs, to be sure, but they slipped over to the wrong side of the line: they used their positions of power to skim money, drugs and weapons from the drug dealers in their district. In the account that follows, we present the facts in the light most favorable to the jury's verdict.

Word of these problems eventually reached the CPD. It began its counteroffensive by ordering Eugene Shepherd, a sergeant in the IAD, to pose as Derrick Simpson, a.k.a. "Silky," a fictitious cocaine trafficker. With the help of IAD and FBI agents, Silky arranged to become a repeat victim of the Officers' acts of extortion. To lure the suspect officers into the trap, Silky had CPD informants call the Officers to let them know that the informant or some other individual was scheduled to meet Silky at a set time and place for a drug transaction. Armed with this information, one or more of the Officers would then show up at the agreed location and extort money from Silky.

For example, on March 28, 1996, an informant known as "Boojie" called Moore and told him that a drug dealer,

Silky, was set to meet someone named Ronnie at a McDonalds for a drug transaction. Moore's partner that evening was Young. In response to the tip, the two set out for the McDonalds in an unmarked police car. At the McDonalds they observed Silky and Ronnie talking in Silky's car; after a few minutes they approached Silky's car with their guns drawn. Moore had Silky get out of his car and took a bag from him that contained between $8,000 and $10,000. Moore and Young then handcuffed both Silky and Ronnie and put them in the back seat of the unmarked police car while their cars were searched. Their efforts were rewarded with the discovery in Silky's car of a digital scale, a one-kilogram cocaine wrapper, and plastic bags for selling small quantities of cocaine.

Eventually Ronnie was released, but Silky remained handcuffed in the back seat of the unmarked police car. Young then got into Silky's car and followed Moore's unmarked police car, with Silky still in it, out of the McDonalds parking lot. At one point the two cars pulled over on the side of the road. Young stopped Silky's car next to the police car, rolled down his window, and told Silky, "We get all the money, or you go to jail—we get all your money or you go to jail." The police officers then continued driving. After a brief detour to the nearby city of Oak Park, they returned to the Austin District where they met up in a bus turnaround. Young parked Silky's car and joined Silky and Moore in the unmarked police car, where the three negotiated how much of Silky's money the officers would get in exchange for not arresting him. Silky also volunteered to help the officers ensnare other drug dealers. In the end, Young gave Silky his pager number, and the two officers confiscated close to $5,000 from what they thought was Silky's stash. The McDonalds portion of this incident was captured on videotape and played for the jury during Shepherd's testimony at the Officers' trial.

After giving the Officers several more opportunities to extort money from him, Silky added a new tactic. He

enlisted Moore's aid in his fabricated drug trafficking operation by paying him to escort fictitious drug couriers as they allegedly transported drugs along the interstate highway. Silky offered to pay Moore $3,500 each time he escorted one of Silky's drug couriers. In exchange, Moore agreed to follow Silky's couriers in and around greater Chicago. In the event a courier was pulled over by a law enforcement officer, Moore agreed to approach the officer, show his police badge, and attempt to talk the officer out of searching the courier's car. On October 16, 1996, Moore followed a man who went by the name of Darin Counsel from a hotel parking lot in Rosemont, Illinois, to Lansing, Illinois. Moore believed that he was escorting Counsel on a drug run, for a fee of $3,500. After successfully escorting Counsel, Silky told Moore that he was going to need more officers to help escort additional couriers over the holidays. Moore indicated that he knew several other police officers who might be interested in serving as escorts. Silky offered to pay those officers $2,500 each time they escorted a narcotics shipment. Eventually, Moore recruited Ramos to escort Silky's drug couriers. Moore received a finder's fee for the referral. Ramos escorted drug couriers on two separate occasions; Moore did so three times.

The government's case consisted of more than these various acts of extortion and drug escort services. Several of the Officers also participated in robberies of drug-houses about which they received information from informants who were also involved with the IAD/FBI investigation. During these robberies, the Officers confiscated drugs and drug paraphernalia, money, and jewelry, none of which was reported or inventoried according to CPD protocol. Several of the raids were set up by the IAD/FBI agents and captured on videotape.

Eventually the Officers were charged in a 39-count superseding indictment and jointly tried before a jury. The court denied their motions for severance, as well as

various other motions challenging the admissibility of evidence. The foursome now appeal these adverse trial rulings, their sentences and their convictions.

## II

A number of the arguments before us are common to all four appellants. We address those first and then turn to the individual points presented by appellants Moore, Ramos and Young.

### A.  Common Arguments

#### 1

The Officers start with an argument that they concede is foreclosed by earlier decisions of this court. They ask that we find that the Hobbs Act does not reach individual robberies involving drug dealers as victims unless the government proves that the particular robbery had a substantial effect on interstate commerce. They contend that no less is required in the wake of the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and *Jones v. United States*, 529 U.S. 848 (2000). Yet they have offered no reason why we should revisit our decisions in *United States v. Sutton*, 337 F.3d 792, 796 (7th Cir. 2003) (rejecting argument that the government must show a substantial effect on interstate commerce to support a Hobbs Act violation); *United States v. Marrero*, 299 F.3d 653, 655-56 (7th Cir. 2002); *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001); and *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000). *Sutton*, *Peterson* and *Marrero* each explicitly considered the Supreme Court's developing jurisprudence in this area and rejected this argument. They hold that no more than a *de minimis* effect on interstate commerce need be shown so long as the entity itself belongs to a class of

businesses that in the aggregate has a substantial effect on interstate commerce. Other courts of appeals to consider this issue have likewise rejected the Officers' position. See, *e.g.*, *United States v. Dupree*, 323 F.3d 480, 485-86 (6th Cir. 2003) (upholding standard allowing *de minimis* impact on interstate commerce); *United States v. Fabian*, 312 F.3d 550, 554-55 (2d Cir. 2002) (same); *United States v. Williams*, 308 F.3d 833, 838-39 (8th Cir. 2002); *United States v. Toles*, 297 F.3d 959, 969 (10th Cir. 2002); *United States v. Diaz*, 248 F.3d 1065, 1084-85 (11th Cir. 2001).

Several courts, including our own, draw a distinction between the robbery or extortion of an individual and the robbery or extortion of a business. See, *e.g.*, *United States v. Lynch*, 282 F.3d 1049, 1054-55 (9th Cir. 2002); *Diaz*, 248 F.3d at 1084-85; *United States v. Wang*, 222 F.3d 234, 238-39 (6th Cir. 2000); *United States v. Collins*, 40 F.3d 95, 100-01 (5th Cir. 1994); *United States v. Mattson*, 671 F.2d 1020, 1024-25 (7th Cir. 1982). Individual drug dealers, however, when robbed in their capacity as such, are treated as business entities. The Officers' conduct in this case targeted the businesses of various drug dealers, and thus only a *de minimis* effect on commerce had to be established to support a Hobbs Act conviction. *Marrero*, 299 F.3d at 655. Although we have recognized the irony in applying the Hobbs Act effectively to protect unlawful businesses, insofar as it bars acts of extortion against interstate criminal enterprises like drug trafficking, we have upheld its application in those situations nonetheless. *Id.* at 654. And while we recognize the recent trend away from the federalization of crimes that are also subject to state prosecution, we see no reason to depart from well-settled law on this question absent a directive from the Supreme Court.

## 2

The Officers also argue that their Hobbs Act convictions must be reversed because the government did not establish

any effect whatsoever on interstate commerce, not even a *de minimis* one. This is a challenge to the sufficiency of the evidence, and "[w]e will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).

The primary flaw the Officers identify in the government's case is the alleged failure of the prosecution to prove that all cocaine originates overseas. This is the way the government intended to prove the link to interstate commerce in this case, and it was a fact on which the government bore the burden of proof. Two of the defendants—Moore and Ramos—agreed to a stipulation that "if called to testify Eady Johnson would testify that she's an expert in forensic chemical analysis with the Federal Drug Enforcement Agency [DEA]. Ms. Johnson would further testify . . . [that] [n]either cocaine nor heroin is produced from substances grown in the United States." Furthermore, neither Moore nor Ramos offered any evidence to rebut the testimony they agreed Johnson would provide. These two are therefore precluded from arguing that the government failed to meet its burden of proof by offering no evidence that cocaine travels in interstate commerce.

Young's and Jackson's cases present a more serious issue. We can find nothing in the record where the government either proved or obtained a stipulation that would have established that all cocaine originates overseas for purposes of its case against the latter two. The government, perhaps recognizing the seriousness of its blunder, attempts to overcome this failure of proof by insisting that neither Young nor Jackson raised this specific argument in a timely motion for judgment of acquittal pursuant to FED. R. CRIM. P. 29(c). That rule requires that all motions challenging the sufficiency of the evidence must be filed within seven days of the verdict in a criminal case. FED. R. CRIM. P. 29(c); see

also *United States v. South*, 28 F.3d 619, 626 (7th Cir. 1994). Although a motion for judgment of acquittal need not spell out the particular basis for a challenge to the sufficiency of the evidence, when such a motion raises specific arguments, any claims not presented in the motion are waived. *United States v. McDonough*, 603 F.2d 19, 21-22 (7th Cir. 1979); see also 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 466 (3d. 2000).

The government, directing our attention to each of the four Officers' motions for judgment of acquittal, insists that the motions did not raise the claim that the government failed to prove that cocaine originates overseas. If we were to confine our consideration to the motions it has identified, we would agree that none presented this specific claim. But those were not the only motions filed. We look first at Young's case. His initial motion for judgment of acquittal broadly challenged the sufficiency of the evidence on all counts against him, and for that reason it would have preserved his claim if he had not filed a subsequent, more targeted motion. But Young did file a later motion, and thus we must consider what it asserted. The district court (within the 7-day period specified in Rule 29(c)(1)) gave Young an extension of time to file by August 21, 1998, a renewed Rule 29(c) motion. Young in fact filed his second renewed motion for judgment of acquittal on August 19, comfortably within the permitted time.

Young's renewed Rule 29(c) motion for judgment of acquittal argued that the government "failed to prove beyond a reasonable doubt that such attempt [at extortion] had an effect on interstate commerce." The argument he presented, however, was that Silky was robbed as an individual and thus the robbery did not affect interstate commerce under the rule in *Mattson*, 671 F.2d at 1020, 1024-25. *Mattson* held that extortion of a bribe from an individual does not affect interstate commerce and could not form the basis for a Hobbs Act conviction. Young did not

mention any argument to the effect that the government had failed to prove that the cocaine moved in interstate or international commerce. We must decide whether this latter argument is encompassed within the former such that it has been preserved for our consideration on appeal.

As we have already explained, the argument that Young clearly presented was correctly rejected on the merits. See *Marrero*, 299 F.3d at 655. But this is beside the point, because our concern is whether the renewed motion was enough to preserve the complaint about the proof of movement in interstate commerce. In our view, it did not. Neither the government nor the court was on notice that Young found the proof at trial on this point insufficient. The challenge that Young and Jackson are now making—that the government failed to establish that cocaine originates overseas—was raised for the first time nearly two years after the jury returned its verdict in this case, at which time the district court no longer had authority under FED. R. CRIM. P. 29(c) to entertain their arguments. *Carlisle v. United States*, 517 U.S. 416, 421 (1996). That is simply too late.

Jackson may have an additional problem with this argument. The district court also gave him an extension until August 21, 1998, to file his post-trial motions, but he did not file his Rule 29(c) motion until September 8, 1998. Thus, it is possible that he is barred by the lack of a timely Rule 29(c) motion. Even if his late filing were deemed to be acceptable, however, he too failed to call the point to the district court's attention. For that reason, both Young and Jackson have lost the right to complain about the failure of proof on a key element of the government's case against them. (We decline the invitation to take judicial notice of the presumed fact that *all* cocaine originates overseas; it is easy enough, as the government offered to do in this very case, to offer proof on this element.)

Before moving on we take a brief detour to consider a twist on the interstate commerce argument that Young alone advances. Young argues that because he did not know that Silky was a drug dealer when he extorted funds from him, his Hobbs Act conviction cannot be sustained. His position, however, is inconsistent with this court's *en banc* decision in *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975) (*en banc*), in which we held that there is "no need to prove that the extortion was actually intended to obstruct or to affect interstate commerce." *Id.* at 59. But see *United States v. McFarland*, 311 F.3d 376, 383 n.15 (5th Cir. 2002) (*en banc*) (*per curiam*) (Garwood, Jolly, Higginbotham, Jones, Smith, Barksdale, DeMoss, Clement, JJ., dissenting) (criticizing expansive interpretation of commerce clause limitation on Hobbs Act advanced in *Staszcuk*). Under this circuit's law, it is irrelevant whether Young knew that Silky was a drug dealer when he extorted funds from him. As Young's lawyer conceded at oral argument, "Mr. Young does not have to have specific intent to commit a crime that will affect interstate commerce. But it's my understanding that Mr. Young would have to have the specific intent to commit a crime, that would, even if unknowing [sic] to him, affect interstate commerce." We agree.

**3**

Finally, the Officers mount a joint, three-part challenge to their convictions under 18 U.S.C. § 924(c). First, they insist that if their Hobbs Act convictions fail, then their § 924(c) convictions fail to the extent that they rely on the Hobbs Act as a predicate offense. Because we have already rejected the premise of this argument, we also reject the conclusion.

Second, the Officers argue that their convictions violate the rule announced in *United States v. Cappas*, 29 F.3d 1187 (7th Cir. 1994), in which this court joined a majority

of the circuits in holding that multiple convictions under § 924(c) may not be based on the use of multiple guns in connection with a single offense. *Id.* at 1189. But *Cappas* did not ban the linking of multiple § 924(c) convictions to different predicate acts. *Id.* at 1190. It held instead that "[w]hile a defendant cannot be convicted twice under § 924(c) for using two guns in connection with the *same* drug trafficking or violent offense, separate convictions are permissible so long as the court's instructions require the jury to connect each gun use to a *separate* predicate offense." *Id.* The jury instructions in this case meet the *Cappas* criteria because each § 924(c) count (for each of the Officers) is linked to a different predicate crime charged in the indictment.

Nor do we see any problem in the jury instructions, although the Officers' third and final argument is that the instructions conflicted with the § 924(c) counts of the indictment, were confusing for the jurors, and deprived the defendants of their right to a fair trial and a unanimous verdict. The indictment charged the Officers with both "using" *and* "carrying" a firearm in relation to a crime of violence or drug trafficking offense. One of the jury instructions, Instruction Number 97, set forth the various § 924(c) counts in relation to each defendant. That instruction tracked the language in the indictment and explained that "[t]he defendants are charged with using *and* carrying a firearm during and in connection with crimes of violence and/or drug trafficking crimes, in violation of Title 18, United States Code, Section 924(c)." (Emphasis added.) In a separate instruction, Instruction Number 99, the jurors were told that in order to establish a violation of § 924(c), the government had to prove "that the defendant used *or* carried a firearm during and in relation to that drug trafficking offense or crime of violence." (Emphasis added.)

A properly preserved objection to jury instructions is reviewed on appeal for abuse of discretion; we will affirm as

long as the instructions on the whole are a fair and accurate summary of the relevant law. *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003). The government insists that none of the Officers called this inconsistency to the district court's attention and thus that their challenge to the jury instructions can be reviewed on appeal only for plain error. *United States v. Hernandez*, 330 F.3d 964, 978 (7th Cir. 2003). To establish plain error, the Officers must show (1) an error, (2) that is plain, (3) that affected their substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.*; see also *United States v. Olano*, 507 U.S. 725, 732 (1993). We need not resolve whether the government's forfeiture argument is correct here, however, because as is often the case, the standard of review is ultimately unimportant. Under either possible standard, the Officers cannot show that the district court's instructions were incorrect.

In *Turner v. United States*, 396 U.S. 398 (1970), the Supreme Court explained that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . , the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id.* at 420. We picked up on this language in *United States v. Bond*, 231 F.3d 1075 (7th Cir. 2000), and noted that there is no need to reverse a conviction that is supported by one of several charged acts so long as the alternative bases for conviction are neither unconstitutional nor illegal. *Id.* at 1078. The government urges us to apply this well-established rule here, and offers *United States v. LeDonne*, 21 F.3d 1418 (7th Cir. 1994) as additional support. In *LeDonne* we explained that "where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count. . . . And proof of any one of those acts conjunctively charged may support a conviction." *Id.* at 1427 (citations omitted). The Supreme Court's decision in *Turner* and our later decisions in *Bond*

and *LeDonne* foreclose the Officers' argument that the government either had to amend the indictment against them to charge using *or* carrying a firearm, or prove that each individual both used *and* carried a firearm at trial.

### B.  Moore and Ramos

#### 1

Moore and Ramos raise several additional challenges to their § 924(c) convictions. Moore asserts that it was simply a coincidence that he carried his service revolver during the various acts alleged in the indictment and for which he was convicted, because as a member of the CPD, he was required to carry his weapon. For that reason, he urges, the government failed to prove that he used or carried his gun "in relation to" a drug trafficking offense, as required by § 924(c). See *Smith v. United States*, 508 U.S. 223, 228 (1993) (holding that § 924(c) requires prosecution to "prove that the use or carrying was 'during and in relation to' a 'crime of violence or drug trafficking crime' ").

Ramos takes this argument in a slightly different direction. He agrees that the evidence shows that Silky hired him to serve as a drug escort, but he claims that his job was specifically limited to displaying his police badge and engaging in "cop talk," if necessary. Like Moore, Ramos says that the fact that he was carrying his service revolver while escorting the alleged drug couriers was a mere coincidence. Because he did not intend to use the gun, he concludes, he did not carry it in relation to the charged drug offenses.

We are not persuaded. This case, after all, comes to us following a jury trial. We must affirm their convictions unless "no rational trier of fact could conclude that the government proved the crime's essential elements beyond a reasonable doubt." *United States v. Young*, 316 F.3d 649,

660 (7th Cir. 2002). A rational juror could have concluded that Moore and Ramos were hired to serve as escorts for Silky's drug couriers because as members of the CPD, they could persuade other law enforcement officers not to detain or inspect the couriers' cars. A police badge and so-called "cop talk" were essential to this plan, but a juror was entitled also to believe that the fact that both officers carried their service revolvers on them was also essential and "in relation to" the plan. Put differently, even if there was no expectation that either Moore or Ramos would have to use a gun actively while escorting Silky's drug shipments, they were both hired to play the role of a police officer, which necessarily entails carrying a service revolver.

To be clear, we are not holding that any time a police officer commits a drug trafficking offense or a crime of violence while carrying his or her police weapon, the officer automatically has violated § 924(c). Our case is much more limited. Officers Moore and Ramos were in fact hired to use their status as police officers, with all the trappings, to protect Silky's drug couriers. That is enough to support their § 924(c) convictions for carrying a gun in relation to a drug trafficking offense. See, *e.g.*, *Young*, 316 F.3d at 660-61.

**2**

Moore's next effort to undermine his § 924(c) convictions is more targeted, but ultimately unavailing. Focusing on the counts relating to the three occasions on which he provided escort services for Counsel, he argues that no evidence was adduced at trial to show that he actually carried a gun on these occasions. The record in this case flatly contradicts that assertion. At one point during the Officers' trial, Sergeant Shepherd testified that on each of the five occasions that Moore and Ramos provided escort services, he could see that they were wearing their guns.

**3**

Likewise, Ramos's final effort to undermine his § 924(c) convictions is going nowhere. He argues that the jury was improperly instructed that he could be convicted for violating the statute if they found that the fact that he carried his police gun provided him with a sense of security or in any way emboldened him to engage in criminal conduct. This, according to Ramos, is an argument foreclosed by the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995).

Ramos mis-reads *Bailey*. In that case, the Court's analysis was confined to the "use" branch of § 924(c). 516 U.S. at 143, 144. *Bailey* does not address the issue in Ramos's case, which is whether he *carried* a firearm *in relation to* a drug trafficking offense. We agree with the government that Ramos's § 924(c) convictions are supported by evidence showing both the "carrying" and the "relation" elements. See, *e.g.*, *United States v. Pike*, 211 F.3d 385, 389 (7th Cir. 2000).

## C. Moore

Moore independently challenges three of the trial court's rulings: first, the denial of his motion to sever his trial from co-defendant Jackson; second, the decision to allow the government to introduce an unredacted version of his proffer statements; and third, the decision to allow the government to introduce Ramos's handwritten, post-arrest statement, which inculpated Moore.

**1**

Moore urges us to find that the district court improperly refused to sever his trial from that of co-defendant Jackson.

But Moore himself never filed a motion in which he asked for such a severance. Instead, Moore filed a motion adopting the pre-trial motions of each of his co-defendants. Relying on that general motion, Moore directs our attention to the pre-trial motions filed by Jackson and Young as support for his claim that his trial should have been severed from Jackson's. Not surprisingly, Jackson's pre-trial motion does not seek severance from his co-defendants on a theory that the evidence against Jackson will prejudice those defendants; such a motion would make no sense. So Moore may not rely on Jackson's motion to preserve the argument that he now makes on appeal.

Co-defendant Young sought severance from all of his co-defendants (although his motion primarily argued why it was necessary to sever Young's trial from Moore's trial) because, as a minor player in the charged conspiracy, Young believed he would be unduly prejudiced by the government's overwhelming evidence against his co-defendants. Specifically, Young argued that the disparity in evidence against the various defendants posed a great risk that he would be convicted on the basis of a "spill-over" effect, and he lacked confidence that the problem could be solved through limiting instructions. Young did not specifically argue that his trial should be severed from Jackson's because of the prejudicial nature of the gang-related testimony the government planned to introduce against Jackson, but we may read that claim into his very broad argument that he would be prejudiced by the evidence presented against his co-defendants.

The government makes two arguments in response to Moore's severance argument on appeal. First, it notes that Moore failed to make a renewed motion for severance at the close of the government's case-in-chief and thereby waived this argument on appeal. Next, and assuming that we do not find waiver, the government argues that Moore is not entitled to a new trial because he must, but cannot, show

that he suffered actual prejudice as a result of being tried together with Jackson.

Even if Moore did not forfeit this argument, we find no merit in it. A district court's decision to deny a motion to sever is reviewed for abuse of discretion. *United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002). Furthermore, there is a strong presumption that co-conspirators will be tried jointly. *Id.* In order to obtain a severance from the trials of her co-defendants under FED. R. CRIM. P. 14, a defendant must prove that there is a "serious risk that a joint trial would compromise a specific trial right." *United States v. Wilson*, 237 F.3d 827, 835 (7th Cir.), *cert. denied sub nom. Hatcher v. United States*, 534 U.S. 840 (2001). We have explained that this requires proof of actual prejudice from a district court's refusal to sever. *Id.*

In this case, the district court took the risk of prejudice into account when it instructed the jurors that "[e]ach defendant is entitled to have his case decided on the evidence and the law applicable to him." This limiting instruction adequately handled any risk of prejudice to Moore from the evidence against Jackson. Because there was ample additional evidence on which to support Moore's conviction aside from any possible spill-over that may have occurred from the evidence against Jackson, it is also the case that he cannot show that he was harmed as a result of the joint trial.

## 2

Moore's next argument—that the district court improperly allowed the government to introduce unredacted information from his proffer statements—is also reviewed under the abuse of discretion standard. *United States v. Robbins*, 197 F.3d 829, 842 (7th Cir. 1999). Before evaluating the merits of this argument, we discuss the relevant background facts.

After his arrest, Moore met with FBI agents, waived his right to silence, and offered an innocent explanation for his conduct. He did all this after he was told that he could conceivably spend the rest of his life in prison if convicted on the various gun, drug, extortion and robbery charges that he faced. Without the benefit of counsel, Moore told the officers that "Silky" was his "big case" and that he was slowly gathering enough evidence to make "the big bust." He conceded that he did not follow police protocol in working the "big case"—for example, he wrongfully retained money that he seized or received from Silky, he failed to inform his superiors at the CPD of his work on the case, and he did not follow CPD procedures for handling evidence in a criminal case. But all of these shortcomings— according to Moore—were done with an eye to making "the big bust." The FBI prepared a five-page post-arrest statement documenting Moore's version of the events.

Moore then retained counsel and met four additional times with the government. Prior to these meetings, Moore signed a Proffer Agreement that stated that if he "should subsequently testify contrary to the substance of the proffer, nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury." Moore then proceeded to give the government detailed information about his relationship with Silky, the various acts of extortion, robbery and drug escorting in which he participated, as well as information about his criminal activities unrelated to the conduct charged in the indictment. It was during these meetings that Moore essentially admitted that he was not conducting an undercover investigation of Silky, and that he had committed acts of extortion and robbery against other individuals.

The government and Moore never struck a plea agreement and the parties proceeded to trial. The government,

under seal, filed a "Submission Regarding Proffer Issues with Respect to Defendant Moore," in which it sought permission to admit portions of Moore's proffer statements in the event that he "advance[d] before the jury a theory of defense inconsistent with his proffer admissions—namely, that he was conducting an undercover investigation of 'Silky.'" In its submission, the government expressed the belief that such a defense would authorize it to admit Moore's complete proffer statements, but at that point it sought permission to use only "those portions of the proffer in which the defendant admits (and details) the criminal acts charged in the indictment, acknowledges the manner in which the money he received was spent, and admits that he was not conducting an undercover investigation of Silky." The district court ruled that should Moore pursue a theory of defense inconsistent with his proffer statements, the government would be allowed to introduce the redacted version of these statements with proper limiting instructions.

At the trial, the government asked the court for a ruling permitting it to introduce the entire proffer, based on statements in Moore's opening statement and on his cross-examination of Shepherd. Moore argues now that this was error, and that the government should not have been allowed to introduce an unredacted account of his proffer statements during its rebuttal argument. Moore's view is that the public authority defense that he asserted was exactly what the government had earlier anticipated, and thus that the government should have been limited to the redacted version of the proffer it had originally proposed to use.

We need not devote much time to this argument because even if Moore is correct that the government should have been limited to a redacted version of his proffer statements, any error in allowing it to introduce additional portions of the proffer statements was harmless in this case. *United*

*States v. Thornton*, 197 F.3d 241, 253 (7th Cir. 1999) (holding harmless district court's failure to redact information because limiting instruction was given and error occurred in trial that lasted nineteen days and contained "strong evidence of the defendants' guilt"). The government's evidence against Moore was strong, and the proffer statements, even if properly redacted, flatly contradicted Moore's defense theory that he was simply pursuing his "big case" in a rather unconventional manner.

**3**

Finally, Moore claims that the district court improperly allowed the government to introduce co-defendant Ramos's post-arrest statement, which inculpated Moore. He asserts that this statement was inadmissible under FED. R. EVID. 804(b)(3), and that its admission violated his Sixth Amendment right of confrontation. We review the district court's decision to admit Ramos's statement under FED. R. EVID. 804(b)(3) for abuse of discretion, and the constitutionality of that decision *de novo*. *United States v. Thompson*, 286 F.3d 950, 961 (7th Cir. 2002). Both aspects of this issue are subject to harmless error review as well. *Id.*

Once again, we can proceed straight to the question of the significance of any possible error in this case without parsing the merits of Moore's claim. Such an approach is appropriate where, as here, the government's case against Moore was so strong even without Ramos's statement. On this record, any possible error in admitting the statement did not materially affect the outcome in the case. *United States v. Castelan*, 219 F.3d 690, 696 (7th Cir. 2000). In *Castelan*, we concluded that the district court erred in allowing the government to introduce a co-defendant's statements against penal interest because "the statements lack[ed] inherent particularized guarantees of trustworthiness sufficient to satisfy the Confrontation Clause," *id.*, but we affirmed Castelan's conviction nevertheless because the

government met its burden of showing that the error was harmless beyond a reasonable doubt. *Id.*

We are satisfied here as well that the government's evidence against Moore, excluding Ramos's post-arrest statement, easily supported his conviction and that any possible error in allowing Ramos's full statement to be read into evidence does not cast doubt over the jury's verdict. The jury heard extensive testimony from Sergeant Shepherd about "Silky's" interactions with Moore. This testimony preceded the introduction of Ramos's statement, and was corroborated by audio and videotapes that were played for the jurors at trial. Because any possible error was harmless, there is no reason to disturb Moore's conviction.

## D. Ramos

Ramos alone attacks the sentence that he received, arguing that the district court improperly rejected his motion for a downward departure from the U.S. Sentencing Guidelines in light of the disparity in the sentences that he and a defendant who is not a party to this appeal received. The law is clear on this point: we lack jurisdiction to review a district court's decision not to grant a downward departure from the Sentencing Guidelines unless the district court was mistaken about its authority to depart in the first instance. *United States v. Aron*, 328 F.3d 938, 940 (7th Cir. 2003); *United States v. Crucean*, 241 F.3d 895, 898 (7th Cir. 2001). In Ramos's case, nothing whatever indicates that the district court did not understand its authority to depart from the Guidelines. At the sentencing hearing, the district judge recognized the argument that Ramos had advanced and, after noting his belief that there were real differences between Ramos and his co-defendant that explained the disparity in their sentences, found no basis for Ramos's argument that the discrepancy was the result of improper prosecutorial conduct. Accordingly, we lack jurisdiction over this portion of Ramos's appeal. *Aron*, 328 F.3d at 941.

## III

For these reasons, we AFFIRM the judgments against all four defendants.

A true Copy:

       Teste:

           _____
           *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*