**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

WESLEY BERNARD WILLIAMS,
  *Defendant-Appellant.*

No. 02-4344

Appeal from the United States District Court
for the District of South Carolina, at Florence.
C. Weston Houck, District Judge.
(CR-01-198)

Argued: June 4, 2003

Decided: August 29, 2003

Before WIDENER, WILKINSON, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Widener and Judge King joined.

## COUNSEL

**ARGUED:** William Norman Nettles, Columbia, South Carolina, for Appellant. Thomas Ernest Booth, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Amy E. Ray, Asheville, North Carolina, for Appellant. J. Strom Thurmond, Jr., United States Attorney, Rose Mary Parham, Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Appellant Wesley Bernard Williams and three other individuals robbed and killed a drug dealer, Kirktrick Cooper, in South Carolina in August 2000. Williams was convicted by a jury of five counts of drug trafficking and possession, Hobbs Act robbery, and possession and use of a firearm. He was sentenced to concurrent terms totaling 45 years' imprisonment. Williams' chief contention on appeal is that his robbery of Cooper failed to affect interstate commerce, as required by the Hobbs Act, 18 U.S.C. § 1951(a) (2000). Because drug dealing is an inherently economic activity that Congress can regulate under its Commerce Clause power, and because Williams' robbery of Cooper falls within that authority as exercised in the Hobbs Act, we affirm the conviction and sentence in all respects.

I.

Beginning in the middle of 2000, Wesley Bernard Williams joined a group that had hatched plans to rob drug dealers for their drugs and money. On several occasions prior to August 2000, the gang had successfully obtained money or drugs in this manner.

On August 13, 2000, Williams met up with Ray Anderson, Arthur Niles, and Holly Carpenter at Carpenter's residence in Myrtle Beach, South Carolina. The three men planned to look for drug dealers to rob in several cities in South Carolina, and Carpenter agreed to drive them around in Anderson's rented van. When the party failed to find any drug dealers around Kingstree or Hemingway, South Carolina, Niles proposed that they rob Ronald Haywood, a known drug dealer who lived in nearby Andrews. The group traveled to Haywood's home where Anderson left the vehicle and spoke to Haywood, who said he had no money or drugs. While the group was at Haywood's residence, however, it received word that Kirktrick Cooper, a man with whom Niles had previously had three drug dealings in 1999, recently received a kilogram of cocaine.

Based on this information, the four individuals decided to drive to Cooper's trailer home to rob him. On the way, Niles told the group

that if they went to Cooper's house and robbed him, they would have to kill him in order to keep the "big dope dealer" and his "hit men" from retaliating against them. Once they arrived at Cooper's home, the group observed Cooper walk outside from his trailer to his car. Anderson gave Williams his .9mm pistol and told him to shoot Cooper. Williams then approached Cooper and shot him in the leg. Cooper proceeded to struggle with Williams for the gun. When Williams regained control over the gun, he returned to the van to get more bullets and tried shooting Cooper again, but the bullets kept falling out of the gun as he tried to discharge it. Meanwhile, Anderson and Niles restrained Cooper and eventually forced him inside the van. Once inside, Anderson demanded money from Cooper. Cooper, however, maintained that he had no money and refused to allow the men to enter his home to look for it.

Thus far thwarted in their robbery attempt, Niles directed Carpenter to drive to a back road. Along the way, Niles tied Cooper's hands up with his shoestrings. The men then questioned Cooper about money and drugs, repeatedly hit him in the face, and threatened to kill him if he did not have any money. Cooper finally told the men that he had money and "a couple of ounces" of crack in his aunt's barn, and also that he had $1,000 in his pocket. Anderson took the money from Cooper's pocket and gave it to Carpenter.

Once the van stopped on a back road, the men released Cooper from the car. Cooper began running away from the van, but Niles, who had taken possession of the gun from Williams during the ride, shot Cooper twice to bring him to the ground. Cooper begged for his life, but Niles shot him again and started to return to the van. Williams noticed that Cooper was moving, however, and he told Niles that Cooper was still alive. Niles returned and shot Cooper again, this time fatally. An autopsy revealed that Cooper was shot a total of five times: three times in the leg, once in the neck, and once in the head. The shots to the leg did not themselves inflict fatal injuries.

After killing Cooper, the party headed back to Myrtle Beach. Along the way, Anderson threw the gun away and divided the money they had taken from Cooper. Carpenter drove the van to a car wash in order to clean the bloodstains, and the men tossed Cooper's personal items into the woods nearby.

Williams was later charged in South Carolina District Court on a five-count indictment with drug, weapons, and robbery offenses stemming from the incident. The government's case consisted primarily of the testimony of Niles, Anderson, and Carpenter. Kevin Davis, Cooper's cousin and a convicted drug felon, also testified that Cooper had acquired one-half kilogram of cocaine in late 1999 and again in 2000. Moreover, the government read to the jury a stipulation in which Williams conceded, among other things, that "drug trafficking is a business that involves interstate commerce with the interstate commodities being cocaine and crack cocaine and proceeds from drug distribution."

The jury convicted Williams on each of the five counts for which he was charged: (1) conspiracy to traffic in crack cocaine, in violation of 21 U.S.C. § 846 (2000); (2) attempt to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (2000); (3) obstruction of commerce by robbery, in violation of 18 U.S.C. § 1951(a) and § 2; (4) using, carrying, and possessing a firearm during a crime of violence resulting in murder, in violation of 18 U.S.C. § 924(c) and (j)(1) (2000) and § 2; and (5) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (2000), § 924(a)(2) (2000), and § 2.

He was sentenced to concurrent terms totaling 45 years' imprisonment. Williams now appeals his conviction and sentence on several of the counts.[1]

## II.

Williams principally challenges his conviction for robbery under the Hobbs Act. The Hobbs Act prohibits robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). A Hobbs Act violation requires proof of two elements: (1) the underlying robbery or extortion crime, and (2) an effect on interstate commerce. *Stirone v. United States*, 361 U.S. 212, 218 (1960).

---

[1]Williams raises additional arguments, not addressed here, in a pro se supplemental brief submitted to the court. We have reviewed his objections and find them to be without merit.

The question on this appeal, simply put, is whether the criminal act affected interstate commerce. Williams argues that his robbery of $1,000 from Cooper had no effect on commerce because there was insufficient evidence to prove that Cooper was dealing cocaine when he was robbed and murdered. The government maintains that there was ample basis for the jury to decide that Cooper was engaged in drug trafficking at the time of the robbery and that the stolen cash represented proceeds from his drug dealing.

Under the Commerce Clause, Congress has plenary authority to regulate (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). Congress exercised the full extent of this authority in the Hobbs Act, which "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence. The Act outlaws such interference 'in any way or degree.'" *Stirone*, 361 U.S. at 215. We have therefore found the Hobbs Act to apply whenever the instant offense has at least a "minimal" effect on interstate commerce. *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976).

Importantly, the Supreme Court's decisions in *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), do not disturb our continued application of this "minimal effects" standard. There is no doubt, of course, that *Lopez* and *Morrison* impose real limits on Congress's exercise of its enumerated commerce power. The present case, however, is lacking in the features that the Court found objectionable in *Lopez* and *Morrison*. As the Eleventh Circuit noted, "unlike the statute involved in *Lopez*, the Hobbs Act contains a jurisdictional requirement that the [particular offense] be connected" to interstate commerce. *United States v. Castleberry*, 116 F.3d 1384, 1387 (11th Cir. 1997). Moreover, unlike in *Morrison*, the regulated subject matter here — robberies of drug dealers — impacts a trade that plainly is both economic and interstate in character.

In recognition of these facts, our sister circuits have uniformly held that the Hobbs Act's jurisdictional predicate still requires only a mini-

mal effect on commerce. *See, e.g.*, *United States v. Jamison*, 299 F.3d 114, 118 (2d Cir. 2002); *United States v. Marrero*, 299 F.3d 653, 654-56 (7th Cir. 2002); *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999); *United States v. Robinson*, 119 F.3d 1205, 1208 (5th Cir. 1997); *Castleberry*, 116 F.3d at 1387; *United States v. Atcheson*, 94 F.3d 1237, 1241-43 (9th Cir. 1996). Particularly in circumstances like this case, where the Hobbs Act reaches a quintessentially economic activity that, taken in the aggregate, substantially impacts interstate commerce, the minimal effects standard does not contravene the teachings of *Lopez* and *Morrison*. *See, e.g.*, *United States v. Guerra*, 164 F.3d 1358, 1361 (11th Cir. 1999) (holding that a robbery of $300 from a business satisfied the jurisdictional element because "an individual defendant's conduct need not substantially affect commerce precisely because the Hobbs Act regulates general conduct — robberies and extortion — which in the aggregate affects commerce substantially").

The Hobbs Act also does not require proof that a defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions. *Spagnolo*, 546 F.2d at 1118-19. Commerce is sufficiently affected under the Hobbs Act where a robbery depletes the assets of a business that is engaged in interstate commerce. *United States v. Buffey*, 899 F.2d 1402, 1404 (4th Cir. 1990). The question is not simply whether one particular offense has a measurable impact upon interstate commerce, but whether the relevant class of acts has such an impact. *Marrero*, 299 F.3d at 655. Drug dealing, to repeat, is an inherently economic enterprise that affects interstate commerce. *Id.* at 654-56. For this reason, the robbery of a drug dealer has been found to be the kind of act which satisfies the "affecting commerce" element of the Hobbs Act, inasmuch as such a robbery depletes the business assets of the drug dealer. *See, e.g.*, *id.*; *Jamison*, 299 F.3d at 119-20.

Williams apparently acknowledges this principle, which he stipulated to at trial, but he now contends that there was insufficient evidence for the jury to conclude that Cooper was engaged in drug dealing at the time he was robbed and murdered, and that the stolen $1,000 constituted proceeds from his drug trafficking business. We disagree. When reviewing "the sufficiency of the evidence following

a conviction, this court views 'the evidence and the reasonable infer-ences to be drawn therefrom in the light most favorable to the Gov-ernment.'" *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (citation omitted). We must sustain the jury's verdict so long as there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

Here, the evidence presented at trial established that Williams and his accomplices stole $1,000 in cash from Cooper, whom they believed to be a cocaine dealer. Indeed, they were motivated to rob Cooper precisely because he was a drug dealer. Testimony presented at trial from Kevin Davis, Cooper's cousin and a convicted drug felon, and from Niles, who had prior drug dealings with Cooper, cor-roborated the fact that Cooper regularly trafficked in cocaine in 1999 and 2000. Moreover, Cooper told the men as he was being robbed that he had a couple of ounces of cocaine in his aunt's barn. He also had $1,000 in cash on his person at the time he was robbed, further sup-porting the conclusion that he was involved in drug trafficking.

Based on all of this evidence, it was hardly irrational for the jury to conclude that Cooper was a drug dealer and that the stolen $1,000 constituted proceeds from his drug business, and therefore that the robbery of Cooper satisfied the elements of the Hobbs Act.

### III.

Williams next challenges his conviction for carrying a firearm dur-ing a crime of violence, arguing that the district court erred in sen-tencing him pursuant to 18 U.S.C. § 924 (2000). Section 924(c)(1) subjects to punishment "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a fire-arm." Section 924(j)(1) then provides that "a person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm," shall "be punished by death or by imprisonment for any term of years or for life" if the killing consti-tutes "murder" under 18 U.S.C. § 1111 (2000).

Williams was convicted under these provisions for using and carry-ing a firearm during his robbery of Cooper and for causing Cooper's

death. The district court instructed the jury as to the definition of murder under § 1111, and the jury returned a special verdict that Williams committed murder. Williams now argues that there was insufficient evidence for the jury to conclude that he murdered Cooper, as defined in § 1111, because Niles committed the murder and because he did not aid and abet Niles.

Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. It further provides, in relevant part:

> Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any . . . robbery . . ., is murder in the first degree.

> Any other murder is murder in the second degree.

*Id.* Under this provision, there are three types of murder relevant to this case. One is first-degree premeditated murder, which requires a showing of premeditation in addition to proof of malice. *See id.* Another is felony murder, or a killing "committed in the perpetration of" robbery or one of the other listed felonies, where there is no requirement that the government prove premeditation to commit murder. *See id.* Finally, there is second-degree murder, which requires only a showing of malice. *See id.* Proof of any of these forms of murder would support the enhanced punishment provided for under 18 U.S.C. § 924(j)(1).

Each of these types of murder requires a showing of malice aforethought. Whether malice is present in a given case "must be inferred by the jury from the whole facts and circumstances surrounding the killing." *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984). To prove malice, the Government does not have to show an intent to kill or injure. *Id.* Rather, malice aforethought "may be established by evidence of conduct which is 'reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *Id.* at 947-48 (citation omitted).

In this case, the evidence adduced at trial was more than sufficient for the jury to conclude that Williams acted with malice aforethought in the murder of Cooper. Williams accompanied the others to rob Cooper, a known drug dealer. On the way to Cooper's house, Williams was present when Niles stated that if they robbed Cooper, they would also have to kill him. Before the confrontation with Cooper, Anderson gave Williams a gun and told him to shoot Cooper if he "act[ed] up." Williams thus was obviously aware of the possibility that robbing Cooper might also entail killing him.

Moreover, while they were robbing Cooper, Williams shot Cooper once in the leg and attempted to shoot him again. Later, Williams handed the pistol to Niles, who then shot Cooper. And Williams ensured Cooper's death by alerting Niles that Cooper was still alive after the fourth shot, prompting Niles to shoot Cooper again. Finally, Williams took his share of the money from the robbery. All of this evidence demonstrates that Williams was aware of the risk of death or serious bodily harm as he actively participated in the robbery. It was thus reasonable for the jury to conclude that Williams acted with malice aforethought. *See United States v. Sides*, 944 F.2d 1554, 1558 (10th Cir. 1991) (holding that there was sufficient evidence of malice where the defendant was aware of his accomplices' plans to commit murder, yet he continued to participate in the robbery and collect his share of the loot).

In light of the finding that Williams acted with malice aforethought, it was proper for the jury to conclude that Williams committed murder under 18 U.S.C. § 1111. Most obviously, since all that is necessary for proving second-degree murder under § 1111 is a showing of malice, this theory supports his conviction under 18 U.S.C. § 924(j)(1). Moreover, because it is clear that Williams intended to rob Cooper and that Cooper died during the course of the robbery, his conviction is justified based on felony murder. *See United States v. Allen*, 247 F.3d 741, 783 (8th Cir. 2001).

His conviction is also warranted under a first-degree premeditated murder theory because there was sufficient evidence for the jury to find that Williams aided and abetted Niles in murdering Cooper. To prove that he aided and abetted Niles in the premeditated murder of Cooper, the government must establish that Williams "knowingly

associated himself with and participated in the criminal venture," which requires evidence that he shared in Niles' criminal intent. *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). The evidence outlined above supports the conclusion that Williams aided and abetted Niles in murdering Cooper, since he was fully aware of Niles' intent to kill Cooper yet he continued to actively participate in the robbery. *See Sides*, 944 F.2d at 1558-59.

Based on first-degree premeditated murder, felony murder, or second-degree murder, the jury was presented with ample evidence to conclude that Williams caused the murder of Cooper under § 1111. His conviction under 18 U.S.C. § 924 is therefore affirmed.

IV.

Lastly, Williams argues that the district court improperly enhanced his sentence under § 2B3.1 of the Sentencing Guidelines for the Hobbs Act robbery conviction. When we review a district court's application of the sentencing guidelines, we must examine the court's legal conclusions de novo and its factual determinations for clear error. *United States v. Wilson*, 198 F.3d 467, 471 (4th Cir. 1999).

Williams' Presentence Investigation Report computed the offense level for each count and assigned a total prison range of life imprisonment. For the Hobbs Act robbery conviction, the Report determined that Williams' Base Offense Level was 20. It then added 6 levels pursuant to § 2B3.1(b)(3)(C) of the United States Sentencing Guidelines for permanent or life threatening bodily injury, and 4 levels pursuant to § 2B3.1(b)(4)(A) for abducting a person to facilitate commission of the offense. Finally, since Cooper was killed under circumstances which would constitute murder under 18 U.S.C. § 1111, the Report assigned the maximum offense level of 43, pursuant to § 2B3.1(c)(1) and § 2A1.1. At the sentencing hearing, the district court adopted the Report's findings, but then departed downward from life imprisonment because Williams was less culpable than was Niles. Consequently, the court sentenced Williams to a total of 45 years in prison.

Williams claims that the murder enhancement under § 2B3.1(c)(1) was improper under a felony-murder rationale because the murder occurred after the robbery was complete. Section 2B3.1(c)(1) of the

Sentencing Guidelines provides that "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 . . ., apply § 2A1.1 (First Degree Murder)." U.S. Sentencing Guidelines Manual § 2B3.1.(c)(1) (2002). As we held above, the jury was presented with more than sufficient evidence to support a finding of first-degree premeditated murder under § 1111, triggering the application of § 2A1.1 regardless of Williams' challenge to the felony-murder rationale. Moreover, even under that rationale, the evidence is clear that the murder was "committed in perpetration of" the robbery, and thus that Williams committed felony murder. 18 U.S.C. § 1111. Simply put, the robbery and the killing of Cooper were so closely related that they can fairly be called part of the same criminal enterprise.

Because the district court properly recognized that the jury held Williams responsible for the murder of Cooper, § 2A1.1 requires a base offense level of 43. U.S. Sentencing Guidelines Manual § 2A1.1. The court imposed this murder enhancement, and, though it was not required to do so, it departed downward for Williams' sentence because it believed that Niles was more culpable than Williams. *See* U.S. Sentencing Guidelines Manual § 2A1.1, cmt. n.1. In view of the factual evidence and the court's reasonable application of the Sentencing Guidelines, we affirm the sentence.[2]

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[2]Because we affirm the application of the murder enhancement, we do not consider Williams' objection to the life-threatening bodily injury enhancement under § 2B3.1(b)(3)(c) of the Sentencing Guidelines.