**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4191

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KWANG HEE KIM, a/k/a Sharky,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  James C. Cacheris, Senior District Judge.  (1:12-cr-00280-JCC-4)

Submitted:  August 27, 2013          Decided:  September 5, 2013

Before TRAXLER, Chief Judge, and NIEMEYER and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Marvin D. Miller, LAW OFFICES OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant.  Neil H. MacBride, United States Attorney, Michael J. Frank, Assistant United States Attorney, Marc J. Birnbaum, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kwang Hee Kim appeals his sentence for conspiracy to commit extortion under the Hobbs Act. See 18 U.S.C. § 1951(a). Finding no reversible error, we affirm.

## I.

From approximately January 2011 through November 2011, Kim was a member of a gang called the "Korean Night Breeders" (the "KNBs"), which used force, fear, violence, and threats of violence to extort businesses in Fairfax County, Virginia. The KNBs targeted for extortion businesses that were owned or operated by South Koreans. They extorted taxi companies, restaurants, bars that sold alcohol after 2:00 a.m., businesses owned by illegal aliens, businesses that employed illegal aliens, and "doumi" businesses.[*] To intimidate victims, the gang's members, dressed in black, would surround victims while one member brandished a knife. The gang also generated additional revenue by selling illegal narcotics.

Kim regularly attended gang meetings during which the KNBs discussed and planned their future crimes. While he was not a gang leader, Kim made suggestions to the leader regarding potential extortion targets, served as a driver on some

_____

[*] Doumi businesses were escort services. The record reflects that federal agents learned that some doumis provided commercial sexual services to some of their customers.

extortion missions, made phone calls to victims in attempts to extort money, provided a physical presence (with other gang members) while victims were being threatened, and personally retrieved extortion money from victims. Kim also obtained marijuana that the gang members consumed before and after extortion missions.

As a member of the KNBs, Kim received a share of the extortion proceeds, along with free food and drinks at certain businesses that the gang shook down. He remained a member of the gang until he was kicked out after a disagreement with the KNBs' leader.

On September 5, 2012, a grand jury charged Kim and three other defendants in a six-count superseding indictment. The indictment charged Kim with one count of conspiracy to commit extortion and two substantive extortion counts. Kim pleaded guilty, without a plea agreement, to the conspiracy count, and the district court, on the government's motion, dismissed the remaining two counts against him.

A probation officer subsequently prepared a presentence report ("PSR") for Kim's case, and later an amended PSR. The defense raised numerous objections to the reports, including, as is relevant here, objections to suggested offense-level enhancements for possessing or brandishing a dangerous weapon and taking advantage of a vulnerable victim, and objections to

3

consideration of losses suffered by criminal enterprises, which Kim maintained were outside the scope of the Hobbs Act.

The district court overruled these objections and largely adopted the findings and conclusions in the PSR. Accordingly, the court determined that Kim's initial offense level was 18. See U.S.S.G. § 2B3.2(a). The court increased the offense level by two because the offense involved an express or implied threat of death or bodily injury, see U.S.S.G. § 2B3.2(b)(1); one level because the loss was more than $10,000 but not more than $50,000, see U.S.S.G. § 2B3.2(b)(2); three levels because a dangerous weapon was brandished or possessed, see U.S.S.G. § 2B3.2(b)(3)(A)(v); two levels because a victim sustained bodily injury, see U.S.S.G. § 2B3.2(b)(4)(A); and two levels because the defendant knew or should have known that a victim of the offense was a vulnerable victim, see U.S.S.G. § 3A1.1(b)(1). The court also decreased Kim's offense level by three for acceptance of responsibility, see U.S.S.G. § 3E1.1, leaving a total offense level of 25. Combined with a Criminal History Category of II, the offense level yielded an advisory range of 63-78 months' imprisonment.

The court imposed a sentence of 60 months. In so doing, the court noted the "very serious" nature of the offense but added that the choice of a sentence three months below the low end of the advisory range was due to Kim's initial cooperation

4

with the government and some then-recent efforts by Kim toward rehabilitation. J.A. 162. The court also noted that although it had overruled several of Kim's sentencing objections, the court would sentence Kim to 60 months regardless of the correctness of the court's decisions on those subsidiary issues, given the seriousness of the offense and Kim's involvement therein.

The district court also ordered Kim to pay restitution in the amount of $12,100 to victims of KNBs' extortions.

## II.

Kim first contends that the district court clearly erred in enhancing his offense level for possession of a dangerous weapon. We disagree.

In considering a challenge to a district court's application of the Sentencing Guidelines, we review factual findings for clear error and legal determinations de novo. See United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006). A sentencing court clearly errs only when we are "left with the definite and firm conviction that a mistake has been committed." United States v. Harvey, 532 F.3d 326, 337 (4th Cir. 2008) (internal quotation marks omitted).

Sentencing Guidelines § 2B3.2(b)(2)(A)(v) provides that a defendant's offense level should be increased by three "if a

5

dangerous weapon was brandished or possessed."  In this context, "dangerous weapon"

> means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. § 1B1.1 cmt. n.1(D); see U.S.S.G. § 2A2.2 cmt. n.1. "The Guideline-sanctioned definition of dangerous weapon encompasses an extremely broad range of instrumentalities," including knives.  United States v. Passaro, 577 F.3d 207, 222 (4th Cir. 2009).  Even if a defendant himself did not possess a weapon, his offense level can be increased when his co-conspirator possessed a weapon in furtherance of their conspiracy.  See United States v. Hunter, 19 F.3d 895, 896 (4th Cir. 1994).  The government bears the burden of proving the applicability of the enhancement by a preponderance of the evidence.  See United States v. Garnett, 243 F.3d 824, 828 (4th Cir. 2001).

Kim maintains that the record was not sufficient to support the conclusions that Je Hyung Yoo carried the knife during Kim's time in the conspiracy and that the knife actually qualified as a dangerous weapon.  We disagree.

The amended PSR contained statements from co-defendant Tae Won Kang that Kim "was aware that co-defendant Je Hyung Yoo carried a knife during extortions," that "Yoo would often take his knife out, open it up, and play with the blade on the way to extort people," and that "Yoo sometimes took the knife out of his pocket and displayed the blade to victims during extortions." J.A. 272. These statements provide sufficient support for the district court's finding that Yoo carried the knife during the time of the conspiracy. And, no further description of the weapon was needed to justify an inference that it qualified as a deadly weapon; the fact that it was a knife that Je Hyung Yoo used to intimidate people was sufficient. See United States v. Scott, 91 F.3d 1058, 1064 (8th Cir. 1996) (holding that testimony that defendant threatened victim with a knife was sufficient to support enhancement even in the absence of a description of the knife).

III.

Kim next argues that the district court erred in enhancing his offense level because the conspiracy targeted vulnerable victims. We find no reversible error.

Under § 3A1.1(b)(1) of the Sentencing Guidelines, a defendant's offense level is increased by two "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." This enhancement "is intended to

7

reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal. Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them." United States v. Etoty, 679 F.3d 292, 296 (4th Cir. 2012) (internal quotation marks omitted). "[T]he role that a victim's disability plays in making it less likely that a crime will be discovered is one of the key reasons why a sentencing enhancement is necessary for defendants who prey on vulnerable victims." Id. at 295.

The district court here found:

> In this case, the defendant and his co-defendants primarily targeted for extortion victims with unlicensed businesses and victims who were illegally in the United States. In addition, these victims were immigrants from the Republic of Korea, some of whom didn't speak English well. All of these characteristics made them unlikely to report their victimization to the authorities, whether for lack of understanding or ability to navigate the U.S. law enforcement system for fear of legal repercussions.

J.A. 148-49 (citation omitted). Kim argues that there was no evidence that any of the particular victims who were illegally in this country were actually made vulnerable by their illegal presence in the United States. He adds that no evidence supports a conclusion that any of the victims could not speak English well or were unfamiliar with the American legal system or were recent immigrants. And, he further maintains that the

8

vulnerable victim enhancement was designed to protect people who are unusually easy targets through no fault of their own. Thus, he argues that considering people to be vulnerable based on their decisions to engage in illegal activity is improper.

We need not resolve the merits of Kim's argument, however, because any error committed by the district court in imposing the enhancement was harmless. The court stated that its decision to sentence Kim to 60 months' imprisonment did not depend on the correctness of the two-level enhancement, and the court noted that it would select the very same sentence were we to hold that the enhancement did not apply. Accordingly, so long as the alternative sentence was not an abuse of discretion, any error in applying the enhancement was harmless. See United States v. Savillon-Matute, 636 F.3d 119, 123 (4th Cir. 2011) (holding that when a district court gives an alternative, substantive basis for a sentence, it is reviewed for abuse of discretion, and if it is found to be reasonable, then any remaining, alleged procedural errors are presumed to be harmless); see also United States v. Hargrove, 701 F.3d 156, 163 (4th Cir. 2012) (rejecting the argument that Savillon-Matute should be read to narrowly apply in unique circumstances).

Assuming that the enhancement was erroneously applied, Kim's offense level would have been 23 rather than 25 and his advisory guideline range would have been 51-63 months. Under

9

that scenario, the 60-month sentence would have been within the guidelines range. A within-guidelines sentence is presumed to be reasonable, see United States v. Mendoza-Mendoza, 597 F.3d 212, 217 (4th Cir. 2010), and the presumption is rebutted only by a showing "that the sentence is unreasonable when measured against the [18 U.S.C.] § 3553(a) factors," United States v. Montes-Pineda, 445 F.3d 375, 379 (4th Cir. 2006) (internal quotation marks omitted). No facts in the record are sufficient to rebut that presumption here.

IV.

Kim finally argues that the district court applied the Hobbs Act in an unconstitutional manner by ordering payment of restitution to victims who Kim maintains engaged in illegal conduct. He specifically claims that three of the victims to whom he was ordered to pay restitution ran prostitution businesses and one of those transported a young woman across state lines in violation of the Mann Act. See 18 U.S.C. § 2421 et seq. He also alleges that those business employed and exploited illegal immigrants. While Congress may regulate commerce "among the several States," U.S. Const. art. I., § 8, cl. 3, Kim maintains that "commerce" in this context "does not include illegal business activity." Appellant's brief at 28. We disagree.

10

The Commerce Clause authorizes Congress to regulate (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "those activities having a substantial relation to interstate commerce." United States v. Lopez, 514 U.S. 549, 558-59 (1995). We have previously noted that "Congress exercised the full extent of this authority in the Hobbs Act." United States v. Williams, 342 F.3d 350, 354 (4th Cir. 2003). The Hobbs Act provides in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section [shall be punished].

18 U.S.C. § 1951(a) (emphasis added). "Commerce is sufficiently affected under the Hobbs Act where a robbery depletes the assets of a business that is engaged in interstate commerce." Williams, 342 F.3d at 354-55. On that basis, we held in Williams that the robbery of a drug dealer "satisfies the 'affecting commerce' element of the Hobbs Act, inasmuch as such a robbery depletes the business assets of the drug dealer." Id. Considering our recognition in Williams that the scope of the Hobbs Act is coextensive with that of the Commerce Clause, see

11

id. at 354, <u>Williams</u> forecloses Kim's argument that "commerce" does not include illegal business activity in this context.

## V.

In sum, finding no reversible error, we affirm Kim's sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

<u>AFFIRMED</u>