**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-6756**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RALPH LEON JACKSON,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Samuel G. Wilson, District Judge. (5:10-cr-00026-SGW-RSB-1; 5:12-cv-80410-SGW-RSB)

———————

Argued: December 10, 2013       Decided: February 7, 2014

———————

Before TRAXLER, Chief Judge, and WILKINSON and DAVIS, Circuit Judges.

———————

Vacated and remanded by unpublished per curiam opinion. Judge Wilkinson wrote a dissenting opinion.

———————

**ARGUED**: Robert Leonard Littlehale, III, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., for Appellant. Anthony Paul Giorno, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee. **ON BRIEF**: Molissa Farber, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., for Appellant. Timothy J. Heaphy, United States Attorney, Jordan McKay, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ralph Leon Jackson, a federal prisoner, appeals the district court's order summarily denying relief on his pro se 28 U.S.C. § 2255 motion in district court, in which he asserted, inter alia, that his legal counsel provided ineffective assistance by failing to advise him properly with regard to his guilty plea. For the following reasons, we vacate the district court's order and remand for further proceedings.

I.

In November 2010, a federal grand jury returned a five-count superseding indictment charging Jackson with assaulting Christina Shay Floyd with intent to commit murder, in violation of 18 U.S.C. §§ 7(3), 113(a)(1) ("Count One); assaulting Floyd with a dangerous weapon with intent to do bodily harm, and without just cause or excuse, in violation of 18 U.S.C. §§ 7(3), 113(a)(3) ("Count Two"); willfully, deliberately, maliciously, and with premeditation and malice aforethought, killing Timothy Phillip Davis by shooting him with a firearm, in violation of 18 U.S.C. §§ 7(3), 1111(a) ("Count Four"); and two counts of using, carrying, and discharging a firearm, during and in relation to crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Three" and "Count Five"). Count Five specifically alleged that, in committing that § 924(c) violation, Jackson did unlawfully kill Davis through the use of a firearm, and that the

3

killing constituted murder under § 1111(a), in violation of 18 U.S.C. § 924(j).

All of the charges stemmed from Jackson's senseless shooting of Davis and Floyd, whom he did not know, while they were parked at a look-out point on the Blue Ridge Parkway in Virginia on April 5, 2010. The statement of facts submitted in conjunction with Jackson's plea agreement sets forth a detailed description of the events that occurred that day. By way of summary, Davis and Floyd were sitting together on a wooden guardrail that separated the overlook's parking lot from the National Forest. Jackson drove his vehicle into the parking area and, approximately fifteen minutes later, fired a shotgun and mortally wounded Davis. According to Floyd, Jackson then got out of the vehicle and fired a second shot that hit her. Jackson then engaged in a physical struggle with Floyd, dropping his gun at some point. Floyd managed to get away from Jackson, and ended up approximately six feet below the guardrail. Jackson then proceeded to throw rocks down at Floyd, causing her to suffer two skull fractures and a broken finger. At some point, Jackson returned to retrieve his gun and Floyd took that opportunity to climb back up the hill to the Parkway. A passing motorist and his wife took the blood-drenched Floyd into their vehicle and brought her to safety. Jackson fled the scene. Shortly thereafter, responding emergency personnel located Davis

4

several hundred feet below the guardrail. He was airlifted to the hospital, but died several days later.

Upon his arrest, Jackson admitted purchasing the shotgun approximately one week before the shooting, and admitted shooting Davis and Floyd. In his defense, Jackson claimed that he believed that Davis and Floyd were his son-in-law and daughter, and that he thought Davis was "f----- with [his] daughter." J.A. 64. Jackson claimed that he shot at Davis after Davis looked at him a few times and that he only realized that Floyd and Davis were not his daughter and son-in-law when he exited his vehicle. He stated "that he tried to grab . . . Floyd, but that she ran[,] and that there was a struggle, but she got away." J.A. 64. He stated that he fired the shotgun twice. He denied throwing rocks at Floyd and denied touching Davis after he shot him.

At his legal counsel's request, Jackson was evaluated by a psychiatrist, Dr. Bruce J. Cohen. According to Dr. Cohen's report, Jackson thought Davis and Floyd were his son-in-law and daughter, and that his son-in-law "sneer[ed] at him while also pulling his daughter's top down and groping her." J.A. 224. Jackson then "stuck his rifle out the window and fired at the individual whom he perceived to be his son-in-law in order to 'burn him' with birdshot, but not to kill him." J.A. 224. Dr.

5

Cohen goes on to relate the story, as told to him by Jackson, as follows:

> After the man fell, the woman yelled at him and upon hearing her voice, he realized that she was not, in fact, his daughter. She was headed toward the cliff and he jumped out of his car and ran toward her to stop her from going over it. She fought him and asked him what he was doing. "I said, 'I don't know, I'm crazy,' because I realized what I'd done." They struggled and she scratched him and ultimately pulled his shirt off and then started down the cliff. [He] threw rocks down at her, "Not to hurt her, but to direct her away from the cliff's edge." A vehicle then pulled up and she got in and he fired a round "up in the air, over the car," because he thought it was a park warden in the car and that they are instructed not to get into armed confrontations and that this would make him drive away. He denied ever having directly shot at the woman, and he stated that he only recalled having fired two shots, the first one being at the man, and the second one being over the car.

J.A. 224.

Based largely on the reports of Jackson and his family members, Dr. Cohen expressed the following opinion regarding Jackson's mental state at the time of the shooting:

> Mr. Jackson clearly has a history [of] chronic poly-substance dependence, which had escalated significantly in the weeks leading up to the present offense. His judgment and thinking were impaired, along with a decrease in work attendance and motivation, likely attributable to this increasing substance usage. He apparently has no prior history of violent or aggressive behaviors and he has had a stable employment and social history. While we do not find evidence of an underlying psychiatric illness such as depression, bipolar disorder, or schizophrenia, or a medical illness leading to changes in mental status, he does appear to have been impaired at the time of the offense, likely due to a combination of intoxication and emotional distress.

6

J.A. 128.

In return for the government declining to seek the death penalty and dismissing Count Two, Jackson agreed to plead guilty to Counts One, Three, Four and Five, and accept a sentence of life imprisonment. The court accepted the guilty plea and sentenced Jackson to life imprisonment plus 420 months (consisting of 240 months on Count One and life on Count Four (concurrent), and 120 months on Count Three and 300 months on Count 5 (consecutive)). No appeal was filed.

## II.

Jackson filed this pro se motion under 28 U.S.C. § 2255, seeking to vacate his guilty plea and proceed to trial on the original charges. In his accompanying pleadings, Jackson reiterated that he believed Davis and Floyd were his son-in-law and daughter, that he "snapped" when Davis "exposed [Floyd's] breasts . . . in an indecent manner, and turned and sneered at" him, and that he "took a shot at [the man he believed was his son-in-law] to scare him," but not "to kill him, or even hit him." J.A. 110. According to Jackson, he "does not [otherwise] have a clear recall of the actual event." J.A. 111.

Read quite liberally, the thrust of Jackson's motion is that his legal counsel was aware, through Jackson's statements and Dr. Cohen's opinions, that he was impaired at the time of the killing and that this evidence would have been admissible at

7

trial to rebut the government's evidence that Jackson had the requisite specific intent to commit first degree murder. Jackson argues that counsel should have formulated a defense on this basis rather than recommending that he plead guilty for a sentence of life imprisonment. Instead, Jackson contends that his counsel erroneously told him that his intoxication was not a defense to the charges against him. See J.A. 82 ("Counsel said it was not a mitigating factor and could not be raised in trial or before the court."); J.A. 105 ("Counsel advised movant that a mental defense of mental impairment wasn't allowed in federal court."). Jackson further argues that, had he known that his voluntary intoxication could have been submitted to rebut the government's evidence of specific intent, and reduce his first degree murder to a lesser offense, he would have rejected the plea offer and proceeded to trial. Without waiting for a response from the government to the § 2255 motion, the district court summarily denied Jackson's motion as frivolous.

### III.

### A.

Rule 4(b) of the Rules Governing Section 2255 Proceedings authorizes a district court to summarily dismiss a claim without obtaining a response from the Government, but only "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not

8

entitled to relief." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4(b). Otherwise, the district court shall order the government to file a response or take other appropriate action. See id.; 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."); see also United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013) (noting that "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court") (internal quotation marks omitted); cf. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970) ("Where the files and records conclusively show that the prisoner is entitled to no relief, summary dismissal is appropriate. If the petition be frivolous or patently absurd on its face, entry of dismissal may be made on the court's own motion without even the necessity of requiring a responsive pleading from the government.").

However, as we long ago recognized, "[i]n most cases, . . . the better practice would be to require, at the very least, a responsive pleading so that United States attorneys may be afforded the opportunity to state the government's position and

sometimes, as not infrequently occurs, to admit the merit or veracity of some or all of the petitioner's assertions." Raines, 423 F.2d at 529. And, of course, when evaluating the pleadings, evidence, and record, we must view the facts in the light most favorable to the petitioner. See United States v. Poindexter, 492 F.3d 263, 267 (4th Cir. 2007).

In this case, we granted a limited certificate of appealability on the issue of whether the district court erred in ruling that Jackson's counsel was not constitutionally deficient in advising Jackson that evidence of his voluntary intoxication would not be admissible, pursuant to United States v. Worrell, 313 F.3d 867 (4th Cir. 2002), to establish that he lacked the requisite specific intent to commit first degree murder. We denied a certificate of appealability as to the other claims raised in Jackson's informal brief, and we appointed counsel to represent Jackson on his appeal. At appointed counsel's request, we also granted Jackson's motion to expand the COA to include as an issue whether Jackson's counsel was also constitutionally deficient in advising Jackson that evidence of his voluntary intoxication would not be admissible to establish that he lacked the specific intent to commit assault with intent to commit murder.

To succeed on his Sixth Amendment claim of ineffective assistance of counsel, Jackson must demonstrate that: (1)

counsel's failures fell below an objective standard of reasonableness; and (2) counsel's deficient performance was prejudicial. See Strickland v. Washington, 466 U.S. 668, 687 (1984). In Hill v. Lockhart, the Supreme Court held that "the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel." 474 U.S. 52, 58 (1985). "[I]n order to satisfy the 'prejudice' requirement [in the guilty plea context], the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59. To be sure, "[s]urmounting Strickland's high bar is never an easy task. Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 371-72 (2010) (citations omitted).

As the district court correctly observed, under the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17, ("IDRA"), "voluntary intoxication is not . . . an affirmative defense" to a murder charge. J.A. 144. However, the "IDRA does not prohibit psychiatric evidence of a mental condition short of insanity when such evidence is offered purely to rebut the

11

government's evidence of specific intent, although such cases will be rare." Worrell, 313 F.3d at 874.

In its order sua sponte denying Jackson's § 2255 motion, the district court found no error in counsel's purported advice regarding the admissibility of evidence of Jackson's voluntary intoxication as relevant to the government's evidence of Jackson's specific intent to commit murder, and found no prejudice from the purported advice. On the present record, however, we cannot affirm the district court's legal conclusions. See id.; see also United States v. Darby, 37 F.3d 1059, 1064 (4th Cir. 1994) (discussing general intent verses specific intent crimes and noting that "defenses such as diminished mental capacity and voluntary intoxication are viable only for specific intent crimes, because such defenses directly negate the required intent element of those crimes") (footnote omitted). Indeed, while the government argues that such evidence would have been an unlikely winner at a jury trial and that Jackson could have still faced a possible death sentence if convicted of second degree murder, the government admits that the evidence would have been admissible to refute the specific intent necessary to obtain a first degree murder conviction.

Setting aside for the moment the obvious question of whether such a defense would have been a good one from a strategic point of view in light of the facts known and admitted

12

to at the time, therefore, it does appear that the defense might have been an available one. However, it is premature at this point to render a determination as to whether Jackson's counsel was constitutionally deficient or, if so, whether Jackson was prejudiced as a result of counsel's advice. There are a number of factual inconsistencies between the stipulated facts pertaining to the shootings that day, Dr. Cohen's report of Jackson's version of the facts, and Jackson's more recent factual representations regarding the events of the day and, in particular, what he now purports to recall about them. Also, because the district court denied the petition before obtaining a response from the government, there is nothing in the record from trial counsel as to what conversations took place between him and Jackson, what advice counsel did or did not provide Jackson regarding the general admissibility of the evidence of his voluntary intoxication, and what advice counsel may or may not have provided regarding the practical viability of such a strategy in light of the government's evidence and Jackson's admissions.

### B.

Our colleague in dissent describes a view of this case in which we need not evaluate the performance prong of Strickland at all because the lack of any prejudice is so clear. And in

the end, his belief that there was no prejudice may prove to be correct.

Nevertheless, the as-yet uncontested, sworn allegations are that Jackson pled guilty to first degree murder and accepted a sentence of life imprisonment because his counsel erroneously advised him, in response to his specific inquiry, that evidence of his intoxication and mental distress was not admissible in federal court to reduce the first degree murder charge to a lesser-included offense, or to otherwise mitigate his actions. He likewise avers that had he been accurately advised, he would have rejected the plea and insisted on going to trial. There is no evidence, at this point, that Jackson's primary motivation in taking the guilty plea was to avoid the death penalty at all costs. In fact, the government has represented that the plea agreement was negotiated "[w]hile the Attorney General was considering whether to authorize the United States Attorney to seek the death penalty." Appellee's Brief at 2 (emphasis added). Clearly, the plea agreement contemplated that Jackson's guilty plea to first degree murder was conditioned upon the AUSA's ability to obtain the Attorney General's agreement not to authorize death as a potential punishment for the crime. And, of course, Jackson would have been free to withdraw his guilty plea to first-degree murder if the Attorney General decided to the contrary. But this quid-pro-quo agreement cannot be viewed

14

in isolation from counsel's alleged _erroneous_ representation that Jackson had _no_ defense to the first-degree murder charge, _no_ hope at all of obtaining a conviction to a lesser included offense, and _nothing_ to gain but the removal of the threat of death as a potential punishment. Thus, we can envision an argument that Jackson, had he known that the evidence was admissible, might have rejected the plea and hoped for the possibility that the Attorney General would decline to authorize the death penalty and that he would ultimately receive a less-than-life sentence. Again, we express no view as the ultimate merits of Jackson's ineffective-assistance-of-counsel claim. However, viewing the _present_ record in the light most favorable to Jackson, we are unprepared to say that a decision to reject the plea agreement and proceed to trial would have been an irrational one on Jackson's part, _see_ _Padilla_, 559 U.S. at 372, or that Jackson's § 2255 claim is "frivolous or patently absurd on its face," _Raines_, 423 F.2d at 529. Rather than summary dismissal, the better practice is to return Jackson's § 2255 motion to the district court for a response and, if necessary, an evidentiary hearing.

## C.

To be sure, this was a terrible event, and we in no way seek to diminish the atrocity that occurred that day. However, in the absence of a fully developed record below, we simply

15

cannot fairly evaluate whether Jackson's counsel's performance fell below an objective standard of reasonableness or, even if it did, whether Jackson was prejudiced as a result. Accordingly, we vacate the district court's order denying Jackson's § 2255 motion and remand this case to the district court for further proceedings consistent with this opinion.

VACATED AND REMANDED

16

WILKINSON, Circuit Judge, dissenting:

Counsel here may well have spared his client the death penalty. He may well have saved his life. For that, the attorney should not be hung on an ineffective assistance of counsel claim. I would affirm the judgment and respectfully dissent.

I.

For many years, couples young and old have pulled their vehicles off the Blue Ridge Parkway onto a scenic overlook and watched their affections glow in the shadows of Virginia's beautiful Blue Ridge Mountains. For that joyful and wholly innocent activity, one member of the couple here paid with his life. The other was seriously injured, and scarred for the rest of hers.

Counsel was presented with a perfectly dreadful case. There was no question of innocence. No one disputes that Jackson committed heinous crimes. According to the stipulation of facts agreed to by Jackson as part of his plea, Jackson shot Davis at least twice with a shotgun, ultimately killing him. Davis fell over the guardrail and Jackson fired again, this time hitting Floyd and causing one of her lungs to collapse. To this day Floyd has eight shotgun pellets lodged in her back. Even after Jackson realized that Floyd was not his daughter -- his purported reason for attacking Davis -- he continued to struggle

with her, causing her to fall to the ledge approximately half a story below. Jackson blocked Floyd's attempt to escape and then threw rocks at her, causing two skull fractures and a broken finger. According to witnesses, when Floyd escaped in the vehicle that rescued her, Jackson fired at it. These are the facts counsel was left with to do the best he could.

The legal standards applicable to this case are well established. The two-part performance and prejudice test of Strickland v. Washington, 466 U.S. 668, 687 (1984), applies to ineffective assistance of counsel challenges to guilty pleas. Hill v. Lockhart, 474 U.S. 52, 58 (1985). As the Supreme Court has emphasized, it's enough, and often preferable, to say there wasn't prejudice in rejecting a Strickland claim. See Strickland, 466 U.S. at 697; see also Hill, 474 U.S. at 60 (rejecting a plea-bargaining Strickland claim on prejudice grounds without analyzing performance).

Although the prejudice prong turns on whether "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial," Hill, 474 U.S. at 59, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances," Padilla v. Kentucky, 559 U.S. 356, 372 (2010). These inquiries will often be determined by the counterfactual trial outcome: "[W]here the

alleged error of counsel is a failure to advise the defendant of a potential . . . defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the . . . defense likely would have succeeded at trial." Hill, 474 U.S. at 59. And, as in the ordinary Strickland case, the trial outcome is to be determined "objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" Id. at 60 (quoting Strickland, 466 U.S. at 695).

Given the horrific facts of this case, a better outcome than that which Jackson received was highly unlikely, and thus equally unlikely would have been Jackson's decision to go to trial. Not only were the facts as unsympathetic as they could possibly have been, but counsel undoubtedly recognized that pressing Jackson's sole defense of "voluntary intoxication" was unlikely to gain traction. Voluntary intoxication is well known to be a weak defense to present to a jury, both because it is voluntary and, in this case, even after Jackson was fully aware that he knew none of the people involved, he continued to visit mayhem upon them. The chances that a trial would have produced a better outcome than the plea bargain did were slim to none.

Moreover, the chances of a worse outcome were clearly present. Jackson would have been eligible for the death sentence upon a conviction of first-degree murder. 18 U.S.C. § 1111(b). A lot of times prosecutors bluff with the death

19

penalty in order to get a plea of life imprisonment. Given these facts, however, there is reason to believe that the prosecution was not bluffing, and that counsel acted wisely in getting the death penalty off the table. In sum, a more lenient disposition than that in the plea agreement was unlikely and a stricter disposition was hardly implausible.

Even if Jackson is correct that a defense of voluntary intoxication would have lowered the conviction from first- to second-degree murder, he would still have faced the prospect of a death sentence. 18 U.S.C. § 924(j)(1) clearly provides that any "murder (as defined in [18 U.S.C. §] 1111)" caused "through the use of a firearm" in the course of violating § 924(c) may be "punished by death or by imprisonment for any term of years or for life." Section 1111(a) defines murder as being one of two types: first <u>or second</u> degree. Section 924(c)(1)(A), under which the government charged Jackson and to which he pled guilty, criminalizes the use of a firearm "during and in relation to any crime of violence." Thus, as we have recognized, the law clearly permits "the enhanced punishment provided for under . . . § 924(j)(1)" for second-degree murder. <u>United States v. Williams</u>, 342 F.3d 350, 356 (4th Cir. 2003).

This conclusion is supported by the Eleventh Circuit's careful analysis in <u>United States v. Julian</u>, 633 F.3d 1250 (11th Cir. 2011). <u>Julian</u> held that "[t]he main point of section

20

924(j) is to extend the death penalty to second-degree murders that occur in the course of violations of section 924(c)." Julian, 633 F.3d at 1256.  In coming to this conclusion, the Eleventh Circuit examined the heading of that section of the Violent Crime Control and Law Enforcement Act of 1994 that added § 924(j): "Death Penalty for Gun Murders During Federal Crimes of Violence and Drug Trafficking Crimes."  Pub. L. 103-322, § 60013, 108 Stat. 1796, 1973.  Given the statutory text and this clear indication of congressional intent, I can see no error in the district court's reasoning that Jackson would still have been death eligible had he been convicted of the second-degree murder charge he now asks us to let him face at trial.

If convicted of second- or first-degree murder -- as is highly probable considering the gruesome and largely uncontested facts of the case -- Jackson could have been sentenced to death under at least three of the gateway mental states in 18 U.S.C. § 3591(a)(2).  There is more than enough evidence to conclude, even in the face of a voluntary-intoxication defense, that Jackson intended to kill Davis, see 18 U.S.C. § 3591(a)(2)(A); intentionally inflicted serious bodily injury that resulted in Davis's death, see id. § 3591(a)(2)(B); or "intentionally and specifically engaged in an act of violence [shooting at Davis], knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless

21

disregard for human life and the victim died as a direct result of the act," id. § 3591(a)(2)(D).  Although Jackson argues that, on the balance of aggravating and mitigating factors in 18 U.S.C. § 3592, no jury could have sentenced him to death, this wishful thinking ignores the heinous and degenerate nature of Jackson's crime.  Importantly, this balancing test would be the same were Jackson convicted of second- or first-degree murder.

During Jackson's Rule 11 plea colloquy, the court made sure that Jackson understood that the government would not seek the death penalty on the first-degree murder charge and that Jackson would instead be sentenced to life in prison on his guilty plea. The court also twice confirmed that Jackson was "fully satisfied with the counsel, representation and advice given to [him] in this case by [his] attorneys."  Throughout, Jackson never exhibited any hesitation or second thoughts about pleading guilty.  Given that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established," United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005), Jackson's conduct in his Rule 11 colloquy taken together with his plea bargain make clear that his primary motivation for pleading guilty was to avoid the death penalty.  Moreover, I cannot accept the argument that because Jackson was 57-years old at the time of his plea bargain, he may have been willing to roll the

22

dice and face a possible death penalty at trial.  A reasonable person of even an advanced age still values his life.

The majority advances the odd hypothesis that, because the Attorney General had not yet decided whether to authorize the death penalty in this case at the time Jackson agreed to the plea bargain, "[t]here is no evidence, at this point, that Jackson's primary motivation in taking the guilty plea was to avoid the death penalty at all costs."  Maj. op. at 14.  On the contrary, the evidence is clearly there in the text of the plea agreement itself.  The only plea provision -- set, no less, in all caps -- that would explicitly allow Jackson to withdraw his plea to first-degree murder was if the government sought the death penalty.  The agreement reads:

> It is further agreed that if I comply with my obligations under the plea agreement, the United States will not seek the death penalty as to any death eligible charge to which I have pled guilty.  IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THE DECISION TO SEEK OR NOT SEEK THE DEATH PENALTY IS SOLELY IN THE DISCRETION OF THE ATTORNEY GENERAL OF THE UNITED STATES AND THE AGREEMENT NOT TO SEEK THE DEATH PENALTY IS CONDITIONED UPON HIS WRITTEN APPROVAL.  IF SUCH APPROVAL IS NOT GRANTED, THE UNITED STATES AND I AGREE THAT I MAY WITHDRAW MY PLEA OF GUILTY TO ANY DEATH ELIGIBLE COUNT SET FORTH IN THE SUPERSEDING INDICTMENT AND PROCEED TO TRIAL ON SUCH COUNTS.  J.A. 22.

While the majority speculates what the government might or might not have done at a trial, the defendant decided not to take that risk.  A critical purpose of a plea agreement is to limit downside risk.  That was done.  In other words, the very

23

lynchpin of the plea agreement was that Jackson would be spared a possible death sentence.  The reality -- as opposed to the majority's speculation -- is that the government did not seek a capital sentence and let the plea agreement stand.

## II.

Although we need not reach the performance prong, in this case there is some overlap between prejudice and performance, because the result that was achieved was realistically a good one.  As for the performance prong, had the lawyer persuaded his client to go to trial, and a poor outcome ensued, we would have another ineffective assistance of counsel claim before us: that counsel performed deficiently in not properly advising his client to accept the plea.  This darned-if-you-do/darned-if-you-don't situation is one in which ineffective claims are the least justifiable, because they illustrate the perils of applying hindsight bias to permissible strategic choices.  See Premo v. Moore, 131 S. Ct. 733, 741 (2011).

Jackson today is not on death row.  The lawyer did his job. Jackson received a considerable benefit and buyer's remorse should not be dressed in the garb of an ineffective assistance of counsel claim.  While the majority recognizes that the district court was permitted by law to dismiss Jackson's petition without obtaining a response from the government or holding a hearing, it  proposes just such proceedings and argues

24

that they would be "better practice." Maj. op. at 15. But a response and a hearing are only needed where there is something to respond to or be heard. Under Strickland, there is no reasonable probability that Jackson or any reasonable defendant would have gone to trial had he been told that voluntary intoxication was a possible defense to first-degree murder. The district court did not err in dismissing the petition, and I would affirm its judgment.